In the Matter of REGIONAL RAIL RE-ORGANIZATION PROCEEDINGS.

TRUSTEES OF PENN CENTRAL TRANSPORTATION COMPANY et al., Petitioners,

v.

CONSOLIDATED RAIL CORPORATION, Respondent.

Misc. No. 75–3.

Special Court, Regional Rail Reorganization Act.

June 24, 1976.

See also, D.C., 421 F.Supp. 1061.

Wayne S. Kaplan, Washington, D. C. (Charles A. Horsky, and Covington & Burling, Washington, D. C.; Paul R. Duke, Philadelphia, Pa., of Counsel), for Trustees of Penn Central Transportation Company.

John L. Altieri, Jr., New York City (Harry G. Silleck, Jr., and Mudge, Rose, Guthrie & Alexander, New York City, of Counsel), for Trustees of Erie-Lackawanna Railway Company.

David C. Toomey, Philadelphia, Pa. (Jared I. Roberts, and Duane, Morris & Heckscher, Philadelphia, Pa., of Counsel), for Trustee of The Lehigh Valley Railroad Company.

John G. Harkins, Jr., Philadelphia, Pa. (A. Carl Kaseman, III, Gregory G. Alexander, Charles J. Bloom, Lawrence S. Coburn, Franklin B. Holland, and Pepper, Hamilton & Scheetz, Philadelphia, Pa., of Counsel), for Consolidated Rail Corporation.

Before FRIENDLY, P. J., and THOMSEN, J.

FRIENDLY, Presiding Judge:

The Trustees of the property of the Penn Central Transportation Company (PC), of the Erie-Lackawanna Railway Company (EL) and of the Lehigh Valley Railroad Company (LV) have petitioned us to require ConRail to assume the obligations of these carriers under non-contributory group life insurance policies for employees not covered by collective bargaining agreements (non-agreement employees).[1] The petition of the PC Trustees also included a request for relief as regards another fringe benefit plan known as the Voluntary Relief Department (VRD). The VRD was created in 1886 by the Pennsylvania Railroad Company as a plan to provide various sickness and accident benefits and funeral expenses for all employees who joined; the apparent reason for the plan was that railroading was considered to be especially hazardous and railroad employees thus could not get commercial insurance; however, the plan was not limited to operating employees. Although need for the program diminished with the enactment of such federal legislation for the protection of railroad employees as the various Safety Appliance Acts, 27 Stat. 531 (1893); 32 Stat. 943 (1903); and 36 Stat. 298 (1910), 45 U.S.C. §§ 1–16; the Boiler Inspection Acts, 36 Stat. 913 (1911); 38 Stat. 1192 (1915); 40 Stat. 616 (1918); 43 Stat. 659 (1924); and 54 Stat. 148 (1940), 45 U.S.C. §§ 22–34; the Federal Employers' Liability Acts, 35 Stat. 65 (1908); 36 Stat. 291 (1910); and 53 Stat. 1404 (1939), 45 U.S.C. §§ 51–60; and the Railroad Retirement Act of 1937, 45 U.S.C. §§ 228a, et seq., the Pennsylvania did not close admission to VRD until 1957. As a result of the closing none of the PC employees who came to the merged company from the New York Central or the New Haven are covered. In addition, the plan is now top-heavy with retirees; as of conveyance date, VRD covered 16,062 active employees and 21,034 retired ones. Apparently none of the other bankrupt railroads in the northeastern region, aside from PC subsidiaries, has any similar plan.

The plan was contributory both as to active and retired employees. Although the VRD provided for employer appropriations if necessary, it was originally intended that the contributions should suffice for required payments. However, the rates were not properly adjusted and, as of December 31, 1975, the shortfall below the actuarial liabilities (assuming a 4% discount rate) was about $9.5 million.

With respect to the group life insurance plans ConRail denied any obligation to assume them; instead it has established its own group life insurance plan for its own employees, including those who came to it from the three petitioners. However, as we understand it, the ConRail group life insurance plan is more modest, and more in conformity with industry usage, than the petitioners' plans where the coverage was in the amount of twice final annual salary (or in the case of the EL plan, at final salary) reduced over the first five years of retirement by 10% per annum.[2] As to VRD, ConRail's position is more complex. With respect to former Pennsylvania Railroad employees who transferred to its employ, it admits liability to continue the administration of VRD and also to continue the payment of benefits before and even after retirement unless it can and does terminate the plan, although some of its contentions with respect to the group life plans might justify a more severe limitation on

1. The EL policy also includes medical benefits and an option for additional contributory life insurance. There has been no suggestion that either feature serves to distinguish the EL policy in any relevant respect.

   The PC insurance program, as also the VRD, covers some subsidiaries of PC.

2. ConRail appended to its brief an affidavit listing 22 persons whose present coverages under the PC policy exceed $100,000, for a total of $3,693,584—the highest being $446,400. Some of these were officers of PC at the time of its bankruptcy, who were dismissed by the PC Trustees; others were employees of the PC Trustees, some for a relatively short period. While these instances are not typical, the burden of maintaining coverage of this magnitude must be substantial. PC estimates the cost of purchasing paid-up insurance under its plan for all those already retired as more than $22 million.

its obligations.[3] At argument ConRail also agreed that, in a spirit of cooperation, it would be willing to continue the administration of VRD for employees who had not become its own so long as the PC Trustees continued VRD and made up the shortfall as to them, although ConRail denied any obligation to do so. We shall expect ConRail to comply with this agreement.

The portion of the Final System Plan (ESP) controlling decision is in Vol. I, Chapter 8, pp. 252–56, headed

> Administrative Assets: Offices, Warehouses, Supplies, Records, Contract Rights, Other Intangibles and Fiscal Assets.

This begins with a general discussion designed to describe the "various categories of administrative assets" and to expose the difficulty of the problem of designating them. One section of this reads as follows, p. 253:

> *Executory Contracts and Agreements.* —This includes, to the extent not designated elsewhere, all rights and obligations under executory contracts and agreements relating directly or indirectly to rail service. Such contracts include without limitation:
>
> - insurance contracts relating to liability, loss or damage to property, fire and theft, employee benefits (including health, accident, and life-insurance benefits) and employee bonding;
> - all contracts relating to employment, terms thereof, benefits, pensions and pension funds and employee housing and feeding;
> - all contracts for the provision of office equipment, office furniture, supplies, custodial services, power, fuel, other utilities and repair and maintenance services and
> - all subscriptions.

Dealing shortly thereafter with the different but related subject of pension plans, the FSP, p. 254, recited USRA's belief "that ConRail should assume, within appropriate limits, the pension obligations of the railroads in reorganization with respect to those employees to whom it offers employment" and that the FSP therefore designated for transfer "those assets set aside for satisfying the pension obligations transferred," subject to certain conditions; the FSP said that:

> USRA will attempt to provide more definitive designations according with these principles, and subject to arrangements with the pension plan trustees, when the FSP is certified to the Special Court.

The FSP then passed to a section called "Designations," which explored yet further difficulties, and then finally arrived at a section headed "Principles of Designation," pp. 255–56, which, so far as relevant, reads as follows:

> *Principles of Designation.*—In light of the foregoing considerations, the administrative assets are designated in accordance with the following principles:
>
> \*      \*      \*      \*      \*      \*
>
> - All administrative assets relating to particular employees, including without limitation all personnel and other personal records, all insurance policies and coverages and all reserves for the payment of federal, state or local taxes arising out of the employment relationship, are designated to be transferred to the employers of such particular employees.
>
> \*      \*      \*      \*      \*      \*
>
> - Executory contracts and agreements are designated in accordance with their subject matter: contracts relating to property to go with the property, contracts relating to personnel to go with the individuals

---

**3.** Perhaps the practical reason for ConRail's lack of concern with regard to employees covered by VRD who have transferred to it is that, as appeared at argument, the contribution rates for active employees have been raised so as to exceed, at least for the moment, the benefits they receive.

and contracts relating to services to go with the service obligation.

\* \* \* \* \* \*

- Within the overall guidelines set forth above, USRA will oversee the work of a transition task force composed of representatives of the estates, ConRail and the profitable railroads, whose task will be the formulation of detailed inventories of administrative assets as necessary, the negotiation of recommendations to USRA as to the disposition of particular items or categories and the formulation of postconveyance arrangements for sharing items of joint interest. After receiving the recommendations of that task force, USRA will make more definitive designations upon certification of the FSP to the Special Court in accordance with the foregoing designations.

\* \* \* \* \* \*

As part of the material certified to this Court on March 12, 1976, USRA listed various conveyance documents between the petitioners and ConRail. As here relevant, the documents in each case broadly conveyed executory contracts and agreements and then excepted various particular matters. Among these exceptions was the following, the result of USRA's efforts as described in the last-quoted paragraph:[4]

NON–AGREEMENT EMPLOYEES

Any and all agreements, plans or obligations of whatever nature and kind relative to so-called "Death Benefits" and "Medical or Health Benefits" pertaining to non-agreement employees and officials of Grantor.

Petitioners say this was an error which we should correct under the power reserved in § 5 of our March 25, 1976 Order of Conveyance to Trustees of Railroads in Reorganization in the Region.[5] Not disputing our power, ConRail argues there was no error to correct. In contrast ConRail concedes that an earlier draft of the Exception to the bill of sale just quoted had contained a reference to "employee relief department benefits" and that this was removed at its own request.

*The Group Life Plans*

■ Petitioners' principal reliance is on the passage from FSP, Vol. I, p. 253, quoted on p. 4. This does, indeed, refer broadly to "all rights *and obligations*" (emphasis supplied) under insurance contracts relating to "employee benefits (including health, accident, and life-insurance benefits)." But we agree with ConRail that this passage should be read as a delineation of the problem and not of the solution. The designations come in the later passages on pp. 255–56, quoted on pp. 1078–1079. The third paragraph, beginning "Executory contracts," is of no assistance to petitioners with respect to the retirees with whom they are here concerned, since "contracts relating to personnel [are] to go with the individuals" and the retirees did not "go" with ConRail. The earlier paragraph starting "All administrative assets" is also of no help to petitioners since insurance policies "are designated to be transferred to the employers of such particular employees"—a designation in accord with the same sensible general principle.[6]

---

4. The exception was proposed by ConRail to USRA; it is not contended that petitioners lacked an opportunity to review it prior to USRA's certification.

5. Our omission of reference to the "fine print" designations in the Appendix to Chapter 8 of the FSP is not because we think them legally irrelevant, but rather because the only applicable matter, at p. 262 as revised in the "Official Errata Supplement," under the heading "*Materials, supplies and administrative assets*," simply refers back to the text of Chapter 8.

6. ConRail also advanced the argument that both the group life insurance policies and the brochures given to employees made clear that coverage would cease if an employee transferred to another employer, in this case ConRail, and hence there was nothing to be transferred. However, we have no real issue before us as to the validity of the Exception as applied to active employees who transferred to ConRail, and accordingly do not find it necessary to rule on this point.

Both sides would derive comfort from the provisions of the RRRA, as amended, with respect to pension plans, which were recently discussed in Judge Wisdom's opinion of May 28, 1976, 421 F.Supp. 1068. We have already mentioned the provisions of the FSP which would have had the result that pension plans would have "gone" to ConRail with the employees covered—*per contra*, that they would not have gone for employees who had retired. Being concerned that this might strand retired employees, especially non-agreement employees, who were living on pensions, Congress amended the Act by adding § 303(b)(6) which directed this Court to assure

> that the operation and administration of the employee pension benefit plans described in section 505(a) of this Act shall be continued, without termination or interruption, by the Corporation [ConRail] until such time as the Corporation elects to amend or terminate any such plan, in whole or in part . . . .

The section further provided:

> All liabilities as an employer shall be imposed solely upon the railroad in reorganization in the event such plan is terminated, in whole or in part, by the Corporation within 1 year after the date of such transfer or assignment (except liabilities as an employer under the Employee Retirement Income Security Act of 1974 for benefits accruing during such period).

Section 211(h) contained provisions, unnecessary here to detail, to fund the pre-conveyance liabilities of these plans; see Judge Wisdom's opinion at p. 1068 & n.5.

Petitioners see in this a broad Congressional policy to preserve fringe benefits for all non-agreement employees, not only active but retired, and regardless of transfer. We find the contrary argument more persuasive. Confronted with two types of fringe benefits, Congress legislated with respect to the pension plans but not as to the group life plans. Petitioners' response that Congress had no reason to believe that legislation on the latter subject was necessary is not convincing. The provisions of the FSP we have sought to parse create at least as much doubt with respect to the group life insurance plans as they did with regard to the pension plans; what probably is true is that the pensioners were more vocal. Moreover, in ordering the transfer of the pension plans Congress was careful to insulate ConRail from monetary liabilities imposed by the pre-conveyance actions of the estates. Petitioners say such explicit provisions were unnecessary here since by their terms the group life plans can be terminated at any time. We may reasonably doubt that Congress knew such details. But assuming the point in petitioners' favor, it carries force only if ConRail does immediately terminate, and even then there may be some interim liability. For if ConRail were to continue the plans as to the retirees here at issue, ConRail would have to make payments without receiving any service in return; petitioners concede—indeed contend—that, in contrast to the pension plans, Congress put nothing in the Act that would give ConRail a claim for such payments against the bankrupt estates. And if petitioners are right that the plans can be terminated, and if that is what ConRail would be well advised to do, we still see no reason for transfer; petitioners have not convinced us that ConRail, rather than they, should bear the practical if not legal burden of so terminating.

A final consideration is that the pension amendment to the Act expressly named ConRail as the entity to continue the pension plans. On the issue here before us, we do not understand why ConRail should have a liability differing from that of any other transferee. This is not unimportant in construing the FSP, since at the time when the FSP ceased to be subject to Congressional veto it was thought that large transfers, particularly of the EL lines, would be made to profitable railroads. If petitioners' construction is correct, and liability for retirees should accompany liability for active employees, some portion of the group life liability to retirees would have had to be allocated to the profitable railroads and some to ConRail; yet the FSP contains no suggestion to that end.

If the "All administrative assets" and "Executory contract" clauses, quoted above, were more ambiguous than we consider them to be, the issue would nevertheless be settled in ConRail's favor by the exception in the bills of sale. It is true enough as a general proposition that what is ultimately controlling is designation in the FSP, its errata sheets and supplements, rather than the conveyance documents; it was because of this that we retained power to correct errors in the latter. But here the FSP itself made clear to Congress that USRA had encountered problems as to administrative assets which it had been unable to solve to the same extent as it had with respect to other properties, that it would continue to work with the estates, ConRail and other transferees, and that, "[w]ithin the overall guidelines set forth above," it would "make more definitive designations upon certification of the FSP to the Special Court."

We recognize with regret that our conclusion may have harsh results. Many of the retirees [7] covered under the group life plans are doubtless of modest means and had counted on this insurance for the benefit of their survivors. We are told that even if the petitioners should desire and have the means to continue these plans, the insurance carriers might decline except at an enormous increase in premium level, or even entirely, because of the age of the insured group. But the language seems too clear for us to construe it as petitioners urge; beyond this we are unpersuaded that Congress intended to saddle ConRail with an obligation to maintain group life insurance for the benefit of people who had never worked for it or even to incur the onus of termination. The group life insurance plans would surely have terminated if Congress had not passed the Rail Act and provided the massive financial aid required to implement it; we see nothing inconsistent in its leaving the decision as to their future with the reorganization trustees and courts.

We therefore dismiss the three petitions with respect to the group life plans. We do not understand that ConRail is claimed to be holding any funds under such plans that should properly be transferred to petitioners. If it is, we are confident that proper arrangements for such transfer will be made.

### VRD

Conceding that it can derive no aid from the bills of sale as regards VRD similar to that conferred by the Exception concerning the group life plans, ConRail relies principally on a clause in the portion of the bills of sale relating to administrative assets which negates the grantee's assumption of liabilities that had "accrued" prior to the date of delivery. It argues that the unfunded liability to retirees on March 31, 1976 had so accrued. The PC Trustees answer that VRD was a pay-as-you-go plan; that the only items properly falling within the "accrued" language would be a few claims that had matured before March 31, 1976, but had not yet been paid; and that the large underfunding is not an accrued liability within the meaning of the bills of sale. Accordingly the Trustees ask for a declaration that "the Trustee's obligation to fund the contribution shortfall in required payments to retired members" is now ConRail's obligation.

A good part of the argument between the parties concerns whether or not a retiree's benefits are fixed upon retirement, under the very terms of the VRD, assuming contributions are maintained. That, of course, might be a very relevant point in a suit brought by or on behalf of a VRD beneficiary. But we see no reason to pass on this point, since as regards the division of obligations between PC and ConRail we must read the conveyance documents not in light of the VRD's Regulations but rather in light of the FSP which the documents were intended to carry out. ConRail is continuing VRD for the Pennsylvania Railroad em-

---

7. Prior to conveyance, there were about 9,205 participants in the PC plan, of whom 2,973 were retired, and 435 in the LV plan, of whom about 161 were retired; we have not been told the number of EL retirees. The great majority of active employees covered by each of the plans are now working for ConRail and are covered under its group life plan.

ployees covered under VRD who have "gone" with it; it apparently concedes that, as to them, it stands in the Pennsylvania's shoes. The dispute concerns (1) employees who have not "gone" with ConRail and (2) the obligation to administer the entire plan. On the first point we think ConRail is right, for reasons similar (save for the Exception clause of the bill of sale) to those stated in our discussion of the group life plans. The second has been eliminated by ConRail's offer to continue the administration for non-transferred participants so long as the PC Trustees maintain VRD. Here again we do not understand the PC Trustees to claim that ConRail is holding any assets that belong to them although, of course, contributions from non-transferred members collected by ConRail as administrator would be made available to the PC Trustees. Accordingly, this portion of the petition of the PC Trustees must likewise be dismissed.

The Clerk will enter judgment in accordance with this opinion.