543 F.Supp. 457 (1982)
CONSOLIDATED RAIL CORPORATION, Relco-PA, Inc. and Investors Diversified Services, Inc.
v.
The PENN CENTRAL CORPORATION.
Civ. A. No. 81-9.
Special Court, Regional Rail Reorganization Act of 1973.
July 14, 1982.
Laurence Z. Shiekman, Steven D. McLamb, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiffs.
John M. Bernard, Jeffrey R. Lerman, John E. Caruso, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Paul R. Duke, Covington & Burling, Washington, D. C., Terrence M. Quirin, Philadelphia, Pa., for defendant.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
WISDOM, Judge:

I.
After Congress approved the Final System Plan (FSP) for the reorganization of the bankrupt railroads of the Northeast,[1] this Court entered an order on March 25, 1976 to implement the FSP, requiring the bankrupt railroads to convey designated properties to other railroads and to Consolidated Rail Corporation (Conrail) in return for certain compensation. The FSP sets out four categories of assets to be conveyed: road properties, equipment, materials and supplies, and general and administrative assets. See I FSP at 239. On March 31, 1976, to comply with our order, *458 Penn Central[2] executed a separate assignment to Conrail for each category of assets. The parties now dispute what was conveyed.
The parties have submitted a stipulation of facts. On January 1, 1960, Relco-PA, Inc. (Relco), then a wholly-owned subsidiary of Investors Diversified Services, Inc. (IDS), entered into an agreement with the Pennsylvania Railroad Company (PRR), providing for the lease by PRR of approximately 4,000 open-top hopper railroad cars that Relco was to purchase from Bethlehem Steel under a conditional sale agreement. The term of the lease was twenty years. PRR and its successor Penn Central carried out the agreement until March 31, 1976. On that date, under our conveyance order, Penn Central executed an Assignment of Rolling Stock and Equipment. This assigned to Conrail all of Penn Central's interests in rolling stock and equipment as well as all of Penn Central's interest in certain financing agreements, including the Relco lease. The exact language was:
NOW THEREFORE, pursuant to the Order of the Special Court, Assignor hereby assigns and conveys to Assignee all of Assignor's right, title and interest in the following properties:
A. All rolling stock and equipment which is subject to the leases ... and other financing agreements ... listed in Exhibit A .... Rolling stock and equipment includes freight cars....
B. The Financing Agreements listed in Exhibit A.
Exhibit A lists the Relco lease. Penn Central also executed an Assignment of Administrative Assets, which assigned.
[a]ll accounts receivable, deposits, escrows, bank accounts, interests in negotiable instruments, funds, reserves, cash and cash equivalents to the extent that they are (or should have been, in accordance with applicable accounting standards) segregated, earmarked, held aside or otherwise specifically allocated to the payment of liabilities that the Grantee is or will become liable to pay or represent amounts attributable to the operations or activities of the Grantor for which the Grantee assumes, on its own behalf or on behalf of The National Railroad Passenger Corporation, either voluntarily or by operation of law, any present or future liability, absolute or contingent.
An example of the kind of accounts, funds, reserves and other assets intended to be included is deposits for equipment lost, destroyed or otherwise disposed of, under equipment trusts or conditional sale agreements which Grantee assumes.
From April 1, 1976 until the present Conrail has continued to use and maintain the hopper cars, paying the required rental.
On March 28, 1980, Conrail purchased all of the common stock of Relco. On the same day, Relco extended the lease for an additional term of ten years.
The current dispute arises from a provision in the original lease for an "adjustment of rental" to be paid to the lessee at the end of the term. The lease directed the lessor, Relco, to sell the cars at the end of the lease term and divide the proceeds among itself, a financing party,[3] and the lessee. The portion payable to the lessee was denominated an "adjustment of rental". Penn Central contends that the conveyance documents of March 31, 1976 do not convey the portion of the rental adjustment that accrued between January 1, 1960 and March 31, 1976. When Conrail and Relco extended the lease, delaying the payment of the rental adjustment, Penn Central filed two suits in the federal district court for the Eastern District of Pennsylvania,[4] alleging that Relco *459 and IDS had breached fiduciary duties owed it by wrongfully causing the extension of the lease. As part of the requested relief, it sought payment of the rental adjustment.
Conrail, Relco, and IDS brought an action in this court, asking for a stay of the proceedings in the district court, and a declaration that Penn Central had conveyed its interest in the rental adjustment to Conrail. We stayed the district court proceedings to the extent that they required a determination whether the March 31, 1976 assignment conveyed Penn Central's interest in the rental adjustment. Consolidated Rail Corp. v. The Penn Central Corp., Sp.Ct. RRRA 1982, 533 F.Supp. 1351, 1355. The district court has since rendered a judgment that the extension of the lease was wrongful. We now confront the merits of the dispute over the proper interpretation of the assignment, and we hold that Conrail is entitled to the full amount of the rental adjustment.

II.
Penn Central contends that its right under the original lease to obtain an adjustment of rental was a fiscal asset and therefore must have been conveyed, if at all, as part of the Assignment of Administrative Assets. Since that document does not contain language covering this right, Penn Central argues that the case is governed by the general principle of the FSP, whereby receivables attributable to preconveyance operations are allocable to the transferor and those attributable to post-conveyance obligations to the transferee. See I FSP at 253. We disagree with both premises of Penn Central's reasoning. We hold, first, that the right to the rental adjustment is not a fiscal asset, and, second, that fiscal assets need not be conveyed solely under the Assignment of Administrative Assets.
Section 5 of the lease deals with the payments at issue here. It provides that, at the expiration of the lease, Relco is to sell the hopper cars. The proceeds of the sale are to go in part to Relco, and in part to the repayment of funds borrowed by Relco, and the remainder is to go to the lessee "as an adjustment of rental".
The characterization of the right to receive the payment as a fiscal asset or as an interest in the cars requires an examination of the lease. It assigns most of the risks and responsibilities usually associated with ownership to PRR. PRR was to continue to pay rent in the event that the equipment was lost, destroyed, or irreparably damaged; it indemnified the lessor; it paid the taxes on the equipment; and it was responsible for all expenses incurred by the lessor in purchasing the equipment, including general corporate and administrative expenses allocable to the acquisition. In sum, the transaction reflects the common practice of using the form of a lease in a financing transaction to achieve desired tax and balance sheet consequences and to give the creditor-lessor a more secure interest in the collateral by allowing him to retain title.[5] Indeed, the Assignment of Rolling Stock and Equipment refers to this lease as a financing agreement.
The term used in the lease, "adjustment of rental", is the basis for Penn Central's argument that the right to the payment is a fiscal asset, accruing ratably over time. The problem with that view is that there is no right to payment, except out of the proceeds of the sale, and the amount of the payment cannot be determined until the sale. It is not in any way related to the rental payments. The amount of the payment will be determined, in large part, by the maintenance undertaken by the "lessee"-owner and by the manner in which the cars are used. Given the risks and responsibilities assigned to PRR by the lease, the right to this type of payments at the end of *460 the lease represents the owner's right to the residual value of property after he has paid off any liabilities secured by the property. The right to share in the proceeds upon sale is, we conclude, an ownership interest in the hopper cars, and the Assignment of Rolling Stock and Equipment is clear in conveying such interests to Conrail.[6]
Even if we accepted Penn Central's characterization of the right to payment as a fiscal asset that accrues with each rental payment, Conrail would still be entitled to the payment. It is true that the assignment of Administrative Assets, Schedule F (Special Funds), does not convey this asset, for it conveys funds only to the extent that they are segregated for the payment of liabilities assumed by Conrail or are attributable to operations that Conrail undertakes. See also I FSP at 253. But we do not accept Penn Central's contention that fiscal assets can be conveyed only under the Assignment of Administrative Assets. We have held on several occasions that the properties conveyed under our conveyance order can be bundles of rights and obligations. See, e.g., Consolidated Rail Corporation v. The Penn Central Corporation, Sp.Ct. RRRA 1982, 533 F.Supp. 1351, 1354 n.3; Stratford Land & Improvement Co., Inc. v. Blanchette, Sp.Ct. RRRA 1978, 448 F.Supp. 279, 284 n.4. Thus, Penn Central could and did assign obligations in the Assignment of Equipment and Rolling Stock, even though obligations technically do not fall within the rubric "Rolling Stock and Equipment". Obviously, then, explicit language in the Assignment of Rolling Stock and Equipment suffices to assign rights and obligations other than rolling stock and equipment. We think the language concerning the right to the payments was sufficiently explicit. The assignment document stated that Penn Central conveyed "all of [its] right, title and interest in the ... [f]inancing agreements". We do not see how the rental adjustment could more plainly have been included without specifically *461 naming it; in a conveyance document covering well over two hundred financing agreements, such specificity was impracticable and unnecessary. See Stratford Land & Improvement Co., Inc. v. Blanchette, Sp.Ct. RRRA 1978, 448 F.Supp. 279, 283; accord, General Motors Corp. v. Blanchette, Sp.Ct. RRRA 1979, 470 F.Supp. 866.
Penn Central contends that the treatment of deposits for destroyed equipment in the conveyance documents shows that "all" as used in the Assignment of Rolling Stock and Equipment does not really mean "all". Destroyed equipment funds are those that Penn Central was required, under the provisions of equipment leases and trusts, to segregate to cover the cost of equipment that was lost, severely damaged, or destroyed. Those funds satisfy an obligation of Penn Central; they do not give rise to any rights under the lease or trust agreements. Consequently, the language in the Assignment of Rolling Stock and Equipment, assigning all rights in the agreements, might not have covered the destroyed equipment funds, and a separate assignment was desirable. The use of a separate assignment for destroyed equipment funds, then, does not indicate that the parties did not intend to convey all rights that were covered by the language.
We are persuaded that the plain language of the Assignment of Rolling Stock and Equipment conveyed the right to the payment, whether characterized as an interest in the property or as a fiscal asset. Accordingly, we render judgment for the plaintiffs.
NOTES
[1] Section 208(a) of the Rail Act, 45 U.S.C. § 718(a) deemed the FSP approved by Congress if neither the House nor the Senate passed a resolution stating that it did not favor the FSP within a certain period after the date of submission. Neither the House nor the Senate passed such a resolution. See Schuler v. Patton, Sp.Ct. RRRA 1976, 416 F.Supp. 1252, 1256.
[2] "Penn Central" is used in this opinion to refer to various related entities, including the Penn Central Transportation Company, the Trustees of the Penn Central Transportation Company and The Penn Central Corporation.
[3] See note 5.
[4] The Penn Central Corp. v. Relco-PA, Inc., E.D.Pa., No. 80-1183 (March 24, 1980); The Penn Central Corp. v. Investors Diversified Serv., Inc., E.D.Pa. No. 80-3659 (September 19, 1980).
[5] The lease was supplemented by an "Inter-company Agreement" that complicates the transaction. Under the Intercompany Agreement, Manor Real Estate Company, a whollyowned subsidiary of PRR, lent Relco all the funds necessary to the performance of Relco's obligations under the lease. The loans were to be repaid only out of the proceeds upon the sale of the equipment and out of the excess of rental payments over installments on the purchase price in the later years of the lease; Manor had no recourse against Relco.
[6] Penn Central relies on two cases for the proposition that, at common law, absent an express provision, an assignment of property does not convey accrued but unpaid benefits attributable to the pretransfer possession of the property. As we have explained, we do not think that the benefit in this case accrued over time. Consequently, both cases are readily distinguishable.

In Phillips Petroleum Co. v. Adams, 5 Cir. 1975, 513 F.2d 355, cert. denied, 1975, 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259, Adams owned property producing oil and gas, which he leased to Phillips. The lease granted Adams a royalty dependent upon the price that Phillips obtained for the oil and gas. The Federal Power Commission permitted oil companies to raise their prices subject to a duty to refund the differential if the FPC failed to approve the increase. When the FPC decision became final, if it approved the increase, the oil company recomputed the amount of royalties due its leaseholders. Phillips instituted a price increase, subject to FPC approval, while Adams owned the property. Adams then assigned the property to the "Schnell group", which owned the property when FPC approval became final and Phillips recomputed the amount payable to the leaseholder. Adams claimed the amount of the payment attributable to pre-assignment production, while the Schnell group contended that that right was assigned with the property. The court held that, without an express provision, a personalty interest ordinarily is not conveyed in an oil and gas assignment, while a realty interest is. This interest it held to be personalty and therefore not conveyed by the assignment.
Not only is the Phillips case of questionable applicability outside the specialized area of Texas oil and gas law, but the payments there were of a significantly different type from those at issue here. In Phillips, the payments were directly related in a causal manner to the oil produced and could be allocated to pretransfer and posttransfer production. The payments were not related to the value of the land; no sale of the land was necessary to determine the amount, if any, of the payment due.
Next, Penn Central relies on Alco Construction Co. v. Peachwood Development Corp., 1970, 257 Md. 269, 262 A.2d 733. There, Alco bought land from Peachwood, which was the beneficiary of a commitment to extend water and sewer lines and which had agreed to contribute to construction costs. Peachwood had contributed $16,500. Alco agree to contribute the remaining $5,000. The Sanitary Commission agreed by letter to Alco that, if the project was abandoned, the contributions would be refunded to the "original contributor". The court held on these facts that, when the project was abandoned, Peachwood was entitled to the refund of the amount it had contributed. There was evidence, then, to support a finding that the parties intended the benefit to remain with Peachwood. There is no similar evidence in this case.