**PENN CENTRAL CORPORATION, Plaintiff-Counterclaim Defendant,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant-Counterclaim Plaintiff,**

v.

**METROPOLITAN TRANSPORTATION AUTHORITY and Connecticut Department of Transportation, Counterclaim Defendants.**

**Civ. A. No. 77–34.**

Special Court, Regional Rail Reorganization Act.

June 10, 1985.

S. William Livingston, Jr., Arvid E. Roach II, Covington & Burling, Washington, D.C., for Penn Cent. Corp.

Laurence Z. Shiekman, M. Duncan Grant, James M. Beck, Pepper, Hamilton & Scheetz, Philadelphia, Pa. (Donald A. Brinkworth, Consol. Rail Corp., Philadelphia, Pa., of counsel), for counterclaimant, Consol. Rail Corp.

Robert R. Prince, Stamford, Conn., for counterclaim defendant, Metropolitan Transp. Authority.

Mark S. Shipman, Robert R. Prince, Schatz & Schatz, Ribicoff & Kotkin, Stamford, Conn., for counterclaim defendant, Connecticut Dept. of Transp.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

The issue dealt with in this opinion has arisen in an action brought by the Trustees of the Penn Central Railroad (Penn Central) to clarify the conveyance to the Consolidated Rail Corporation (Conrail) of certain trackage rights. Conrail asserted a counterclaim seeking a declaratory judgment that Penn Central remained obligated to fulfill several obligations under two agreements made by Penn Central and the transportation authorities of New York and Connecticut. On March 9, 1978, the court granted judgment on the pleadings to Penn Central on its claim and dismissed Conrail's counterclaim with leave to replead. Conrail's amended counterclaim stated four separate counts in some of which the transportation authorities were named as defendants; all but one of these have been settled by agreement of the parties. The sole remaining issue is whether the burden of an annual credit of $1.837 million (the Credit) against the expenses of Penn Central's operating and maintaining the Grand Central Terminal (GCT) for commuter services for the account of the authorities remained with Penn Central in the period between April 1, 1976, the date on which a large part of Penn Central's transportation properties were conveyed to Conrail, and December 31, 1982, when Conrail ceased providing commuter service pursuant to the Northeast Rail Service Act of 1981, 45 U.S.C. § 744a. All parties, including the transportation authorities, have moved for summary judgment with respect to this issue and have submitted voluminous briefs, affidavits and exhibits. We grant the motions of Penn Central and the transportation authorities and deny Conrail's motion.

The disputed Credit is part of the complex arrangements made by Penn Central with the transportation authorities of New York and Connecticut in two Suburban Passenger Train Service Agreements relating to commuter and passenger operations into and out of GCT in New York City. We recently considered these agreements in *Consolidated Rail Corp. v. Metro-North*

*Commuter R.R.*, 598 F.Supp. 1571 (Regional Rail Reorg.Ct.1984) (*Metro-North*). Familiarity with that opinion is assumed; we repeat only such facts as are pertinent to the issues here.

The first agreement, the West End Agreement, dated October 27, 1970, was made with the New York Metropolitan Transportation Authority (MTA) and the Connecticut Department of Transportation (CDOT), acting through the Connecticut Transportation Authority (CTA), and related to the commuter service to and from GCT in New York City formerly conducted by the New York, New Haven & Hartford Railroad Company (the New Haven). It consisted of four separate agreements. Under the first, MTA purchased the New Haven's former properties between Woodlawn Junction and the New York-Connecticut boundary. In the second, Penn Central leased to CTA for a term of 60 years the New Haven's former properties between the boundary and New Haven and three other Connecticut cities. A third, entitled the GCT Joint Facilities Agreement (JFA), the one here at issue, gave MTA/CTA service access to GCT on terms stated below. The fourth was a service contract under which Penn Central agreed to operate commuting services between New York and Connecticut for the account of MTA and CTA.

The other agreement, the Harlem-Hudson Agreement, dated June 1, 1972, dealt in a similar manner with suburban passenger service from GCT to Poughkeepsie, New York on what had been the New York Central's Hudson Division, and Dover, New York on what had been its Harlem Division. Penn Central leased GCT and Penn Central's other transportation properties used to provide this service to MTA for a term of 60 years, and agreed to operate the commuting service for MTA's account. Such provisions as are pertinent to the present controversy will be described as they become relevant.

The JFA assured the MTA/CTA service access to GCT, which was necessary because the line conveyed to MTA under the West End Agreement originated at Woodlawn Junction rather than at GCT. In addition, and more important for present purposes, the JFA allocated the expenses of operating and maintaining GCT between expenses attributable to the West End commuter service, for which MTA/CTA were responsible, and other uses, for which Penn Central remained responsible. Section 301 of the JFA provided that Penn Central should send MTA and CTA a quarterly statement "setting forth as a credit or debit as the case may be Proportionate GCT Net Revenues and as debits the Harlem Toll, Special Charges and any amount payable to Penn Central pursuant to the provisions of Section 405 hereof." [1] MTA and CTA each were entitled to half the net credits and bore half of the net debits. However, as long as the service contracts remained in effect, net credits and net debits were not to be paid separately but were to be treated respectively as a revenue or a cost of running the commuter service.

Section 302 defined "Proportionate GCT Net Revenues" as follows:

Proportionate GCT Net Revenues shall be the amount which results when concession revenues from GCT minus the cost of the operation, maintenance and

1. The Harlem Toll was defined in § 303 as a share of the costs of operating and maintaining the facilities between 59th Street in Manhattan and Woodlawn Junction and the four central tracks between 59th Street and GCT; this share consisted of an annual payment of the greater of $2.9 million or $2.4 million multiplied by the ratio of Penn Central's total service costs (as defined in § 404 of the service contract) for the preceding calendar year to the total service costs in 1971. Special Charges were defined in § 304 of the JFA as (1) accounts which accumulated certain net service costs incurred by Penn Central in the area between Woodlawn Junction and GCT, and (2) the costs of special studies required by the JFA. Section 405 of the JFA provided for payments by MTA/CTA to Penn Central in the event that the authorities exercised their right to refuse to permit Penn Central to convert a portion of GCT to a nontransportation use, and the space to be converted was not reasonably required to operate the commuting service. The meaning of "Proportionate GCT Net Revenues" is discussed in the text below.

repair of GCT ... is multiplied by a fraction of which the numerator is the number of Car and Locomotive Entrances of the Service and the denominator is the total number of Car and Locomotive Entrances, and the product thereof is adjusted by an annual $2,000,000 credit.... MTA/CTA shall consider reducing the amount of the annual $2,000,000 credit referred to above if either on an annual or monthly cumulative basis such credit exceeds 34% of Penn Central's then current "Income—Land & Building" account ... and in such consideration shall take into account the level of income available, the amount of usage and other appropriate considerations.

The Harlem-Hudson Agreement resulted in MTA's taking responsibility for the remaining rail operations into and out of GCT except those provided by Amtrak, although Penn Central continued to provide the services for MTA's account. GCT was leased to MTA, which assumed all of Penn Central's obligations under the JFA except that Penn Central was to "remain liable for the annual $2,000,000 credit referred to in Section 302 of the GCT Joint Facilities Agreement...." This provision left the West End Agreement intact, since Penn Central continued to keep the accounts established in that agreement, and subsidy payments for GCT expenses under the JFA were included as part of the overall subsidy obligations of MTA/CTA under the service contract; the Credit was accounted for by reducing Penn Central's reimbursable costs of running the overall service.

On June 2, 1975, the Penn Central Trustees, MTA and CTA agreed to reduce the Credit to $1.837 million. This was not done pursuant to the reconsideration clause contained in § 302 of the JFA, however, since this event triggering its applicability had not occurred. Rather, this reduction was part of an agreement whereby MTA and CTA were freed from their obligation to pay certain real estate taxes assessed against nontransportation properties in the GCT area.

The gist of Conrail's argument is that the Credit reflected a long antecedent understanding that the operator of the West End commuter service was entitled to have the share of GCT expenses attributable to this service defrayed by a share of the net income (which we will follow the parties in calling "ground rents") from the nontransportation properties erected over the tracks leading to GCT, and that the burden of the Credit should pass to Penn Central since such properties were not conveyed to Conrail. While denying that the history is as conclusive as claimed by Conrail, Penn Central defends primarily on the basis that the Regional Rail Reorganization Act (Rail Act), the Final System Plan (FSP) and the conveyance documents contemplated that the burdens as well as the benefits of the various agreements between Penn Central and the transportation authorities of New York and Connecticut should pass to Conrail.[2]

The history of the agreements between the New York Central and the New Haven with respect to the GCT properties up to the conveyance of the New Haven's property to Penn Central on January 1, 1969, is set forth in the *New Haven Inclusion Cases*, 399 U.S. 392, 438–51, 90 S.Ct. 2054, 2082–89, 26 L.Ed.2d 691 (1970). *See also New York C.R.R. v. New York, N.H. & H.R.R.*, 24 Misc.2d 414, 208 N.Y.S.2d 605 (1960), *aff'd as modified*, 13 A.D.2d 309, 216 N.Y.S.2d 928 (1st Dept. 1961), *aff'd mem.*, 11 N.Y.2d 1077, 230 N.Y.S.2d 226, 184 N.E.2d 194 (1962). We state only the essentials. In the early years of the century, the State of New York passed legislation requiring that the railroad tracks for 15 blocks north of 42d Street be placed underground. This left the New York Central, which owned the land, with a large tract of midtown Manhattan suitable for realty development. In 1907, the New

---

**2.** All parties agree that MTA and CDOT were entitled to the Credit from someone. Conrail in effect paid the Credit, while disclaiming liability, during the relevant period, since MTA and CTA deducted the amount of the Credit from the subsidy payments otherwise due to Conrail under the service contract, *see Metro-North, supra,* 598 F.Supp. at 1579.

York Central made an agreement with the New Haven, which had acquired the right to run trains into Manhattan in an 1848 agreement with the New York Central's predecessor and in state legislation, to construct the present GCT. Each railroad was to contribute to the costs of maintenance and operation in accordance with its respective usage of the terminal, and all rentals and other compensation received from use of the terminal properties were to be credited against the cost of operating and maintaining the terminal. In 1913 they entered into a supplemental agreement which provided for sharing construction and maintenance costs of other buildings as well as the terminal and which reaffirmed that all rentals should be credited to the terminal enterprise. No provision was made in either of these agreements for the eventuality, which occurred in 1964 and continued thereafter, that the income from these properties might exceed the terminal costs. The trustees of the New Haven, which had filed a petition for reorganization in 1961, demanded a share of this excess income; the New York Central refused, and the trustees filed suit. Later, when the trustees of the New Haven began negotiations for its inclusion in the New York Central-Pennsylvania merger, Penn Central insisted as a condition of the New Haven's inclusion that absolute title to the terminal properties should be vested in Penn Central. The New Haven trustees agreed, but bondholders of the New Haven pressed the claim to a portion of the excess income as compensation. A special master appointed by the New Haven reorganization court concluded, and the court found, that the New Haven was entitled to half of the excess income. The Interstate Commerce Commission found that half of the excess income amounted to $2,225,000 per annum, which, capitalized at 8%, amounted to $28,438,000, and this sum was incorporated in the price Penn Central was required to pay the New Haven. The bondholders' claim was limited, however, to the excess income

after the costs of operating GCT had been reduced to zero. The reorganization court found that the New York Central/New Haven arrangement was predicated on first applying the ground rents from the non-transportation properties to offset GCT expenses and that Penn Central rather than the New Haven was entitled to the benefit of this since it had assumed the burden of operating rail services formerly provided by the New Haven. This holding was affirmed by the Supreme Court. *New Haven Inclusion Cases, supra,* 399 U.S. at 446–51, 90 S.Ct. at 2086–89.

Conrail has collected an impressive array of memoranda and drafts of the West End Agreement, together with statements by agents of Penn Central and MTA made subsequent to the execution of the West End and Harlem-Hudson Agreements, which tend to show that the Credit was exacted by the transportation authorities in negotiating the West End Agreement in order to preserve the long standing arrangement whereby net income from the nontransportation properties was first applied to reduce the expense of operating and maintaining GCT. The Penn Central negotiators did not resist this in principle, although they were careful not to surrender their recently acquired property rights to all of the excess income from the non-transportation properties; such disagreement as existed concerned the determination of the amount by which GCT expenses were to be reduced. That disagreement was resolved by a decision to use a figure derived from a calculation made for MTA/CTA in November, 1968 by L.E. Peabody & Associates. Peabody determined that the proportionate use of GCT made by the New Haven in 1967, the last full year for which figures apparently were available, was 34%, and, based on this, that the amount of GCT terminal expenses chargeable to the West End commuter service in 1967 was $2,056,674, which was then rounded off to $2,000,000.[3] The 34% figure

---

**3.** The portion of GCT expenses attributable to the West End commuting service was relevant because MTA/CTA were then to take responsibility only for those services and Penn Central had "paid" for the New Haven's share of the

also formed the basis for the reconsideration clause in § 302 of the JFA: since $2,000,000 from nontransportation revenues were first applied to offset operating expenses of GCT, a decline in the former to a degree that would cause $2,000,000 to exceed the 34% share of the operating expenses on which the Credit was based would cause the Credit to erode the "excess income" from the nontransportation properties for which Penn Central had already "paid" the New Haven. Penn Central notes that its negotiators resisted attempts by MTA/CTA to obtain a proportional share of ground rents from the nontransportation properties, proposing a fixed credit instead. They note further that, once the Credit was fixed as such, the authorities added the requirement that the Credit be an unqualified obligation of Penn Central, not one payable solely out of nontransportation revenues. None of this, however, is inconsistent with the fact that the reason for the Credit was to preserve for the authorities, which had assumed the burden of the commuter services, the historic right of the original operator, the New Haven, to be relieved of its share of the operating expenses of the GCT by application of nontransportation revenues against such expenses.

However, it is one thing to agree with Conrail that the Credit had its source in earlier agreements concerning the application of ground rents from the nontransportation properties against GCT expenses, and quite another thing to say that the Credit was so linked with these revenues that the burden of the Credit after April 1, 1976 should rest on Penn Central simply because it retained ownership of these properties. After April 1, 1976, Penn Central ceased to have any connection with commuter rail services into and out of GCT, which were operated by Conrail under subsidy arrangements whereby the transportation authorities paid all the operating expenses as defined in the agreements less the Credit. Answering the

question whether the burden of paying the Credit stayed with Penn Central or was transferred to Conrail requires an examination of the Rail Act, the FSP and the conveyance documents.

As noted in *Metro-North, supra,* 598 F.Supp. at 1576 & n. 2, the Rail Act took specific account of the West End and Harlem-Hudson agreements. Section 303(b)(2) provided:

> All rail properties conveyed to the Corporation or any subsidiary thereof, the respective profitable railroads operating in the region, States, and responsible persons under this section shall be conveyed free and clear of any liens or encumbrances, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided at the time of enactment of this Act for the continuance of rail passenger service or any lien or encumbrance of no greater than 5 years' duration which is necessary for the contractual performance by any person of duties related to public health or sanitation. Such conveyances shall not be restrained or enjoined by any court.

45 U.S.C. § 743(b)(2); *see also id.* § 744(e)(3) (providing that passenger service arrangements described in § 303(b)(2) should continue as provided in such arrangements rather than by the general provisions of § 304(c)(2)(A) and (C)). Although § 303(b)(2) specifically refers only to rail properties conveyed, which did not include the properties used in providing the West End service since the state authorities already owned or leased these properties, the legislative history cited in *Metro North, supra,* 598 F.Supp. at 1576 n. 2, shows that by adding § 303(b)(2) Congress meant to preserve the West End and Har-

excess income above operating expenses in connection with the New Haven's inclusion.

lem-Hudson agreements undisturbed except that Conrail would replace Penn Central as operator of the commuter service. Congress' intentions in this regard were implemented in the FSP, which noted at Volume I, page 45, that the Rail Act "requires ConRail to honor" the commuter service contracts with MTA and CDOT covering Penn Central's "services in New York and Connecticut radiating from Grand Central Terminal...." Accordingly, the FSP directed at the same page that Conrail "will assume these contracts and will operate ... [a]ll commuter services operated by [Penn Central] radiating from Grand Central Terminal over former New York Central and New Haven lines." Nothing in this provision suggests that the bulk of the contracts should pass to Conrail but that Penn Central should remain saddled with an obligation to the transportation authorities of $2 million a year.[4] Rather, both the legislative history of the Rail Act and the FSP indicate that Conrail was to assume these contracts *in toto*.[5]

Penn Central relies also on the Bill of Sale and Assignment from the Penn Central Trustees to Conrail, identified as Special Court Document PC–CRC–AA, which was annexed to this court's conveyance order of March 25, 1976, but this hardly advances its case. The instrument provided in Schedule E for the Trustees to convey all their rights to all contracts "used or useful in the provision of rail services to be assumed by [Conrail] in connection with the properties conveyed to [Conrail] by this Bill of Sale and Assignment...." It provided further that Conrail assumed "the foregoing contracts and the obligation to perform and observe all covenants and conditions therein contained ... including the obligation to make required payments thereunder," except as otherwise provided. Conrail argues that these provisions do not

apply since property interests in GCT and the commuter lines sufficient to provide the service were already held by MTA and CDOT and were not conveyed. Still, the conveyance documents must be construed in light of the provisions of the FSP, which, as we have seen, evidences the intention that Conrail assume the rights and obligations established in the West End and Harlem-Hudson Agreements. We have previously noted that "what is ultimately controlling is designation in the FSP, its errata sheets and supplements, rather than the conveyance documents...." *Stratford Land & Improvement Co. v. Blanchette*, 448 F.Supp. 279, 284 (Regional Rail Reorg. Ct. 1978) (quoting *In re Regional Rail Reorganization Proceedings*, 421 F.Supp. 1076, 1081 (Regional Rail Reorg. Ct. 1976) (*VRD*)). While in *Stratford* and *VRD* we did not apply this principle, both those cases dealt with general designations of property which the FSP expressly anticipated would be refined in the later Bill of Sale. I FSP at 256. In this case, on the other hand, the statement in the FSP that Conrail must honor the West End and Harlem-Hudson Agreements is specific and unambiguous, *see* I FSP at 45, and we thus do not consider the failure of the Bill of Sale to cover the West End Agreement by its express terms as leading to a contrary conclusion. In addition, the conveyance documents should be read in light of their practical construction by the parties. Conrail's actions after the conveyance make clear that it regarded the bundle of contracts with the authorities as having been conveyed. After April 1, 1976, it continued to operate the same commuter services into and out of GCT as the Penn Central had done, and it received the same subsidy payments as Penn Central had received except for its refusal to allow the Credit, which

---

4. To whatever extent Conrail was required to make up the Credit from other revenues, this expressed intention to substitute Conrail for Penn Central under the West End Agreement overrides the general principle relied on by Conrail that passenger operations were not to be subsidized by revenue from other Conrail operations. *See* I FSP at 40–41.

5. As pointed out in *New York Dock Ry. v. Consolidated Rail Corp.*, 434 F.Supp. 1245, 1248 (Regional Rail Reorg. Ct. 1977), the FSP was approved by Congress and has the force of law, Rail Act § 208(d)(1), 45 U.S.C. § 718(d)(1).

the authorities nonetheless recouped by deducting it from the subsidy payments, *see, supra,* note 1, and three other disputes concerning provisions of the West End and Harlem-Hudson Agreements that were subsequently settled by the parties. When the JFA was amended in 1979, the amendment was executed by Conrail—not Penn Central—and the authorities.

Conrail argues that Congress did not concern itself with the particulars of the arrangements embodied in the West End and Harlem-Hudson Agreements, and that the inference from the provisions of the FSP quoted above, that Conrail should be substituted in all respects for Penn Central under the Agreements, is overcome by other provisions in the FSP. Executory contracts, it correctly says, fall within the category of "administrative assets" under the FSP, which also recognized that such assets may have to be divided. I FSP at 252–55. More particularly, Conrail points to a passage in Volume I at page 256 for the principle of designation relating to executory contracts:

> Executory contracts and agreements are designated in accordance with their subject matter: contracts relating to property to go with the property, contracts relating to personnel to go with the individuals and contracts relating to services to go with the service obligation.

Conrail would have us draw the conclusion that since the obligation to provide the $2,000,000 Credit against the operating expenses of GCT had its source in the nontransportation properties, it therefore should "go" with them.

Even if we deemed the provisions of the FSP directing Conrail to honor the West End Agreement sufficiently ambiguous to require resort to this principle of designation, we would not draw the conclusion that Conrail would have us. The JFA was a "contract relating to services" that went with the service obligation to Conrail; the Credit, which was an integral part of the JFA, went with it. To be sure, it might not have been inequitable for Congress or the United States Railway Association (USRA)

to have provided that Penn Central's revenues from the nontransportation properties in the GCT project should be devoted in the first instance, up to the amount of $1,837,-000, to the purpose for which they had historically been devoted, namely, subsidizing the GCT operating expenses, and relief from this obligation was a distinct benefit to Penn Central. But it was equally rational for Congress and the USRA, and in greater accordance with the general plan of the Rail Act which provides only for the conveyance of assets or rights used or useful in transportation, § 102(12), 45 U.S.C. § 702(14), to have provided that when Penn Central was obliged to convey the bulk of its transportation assets to Conrail and others, it should retain its nontransportation assets free and clear of any burdens with respect to transportation service. This, as we read § 303(b)(2) of the Rail Act and the FSP, was what Congress and the USRA intended to do. Although the historical origin of the Credit doubtless was the right of the New Haven to have its contributions to the development of the nontransportation properties recompensed by applying the revenues therefrom to the GCT expenses, nothing in the JFA or elsewhere linked the Credit with receipt of the ground rents in any significant legal sense. Apart from the reconsideration clause, Penn Central was liable for the Credit even if no ground rents whatever were received. This was the contract which Conrail admittedly assumed in most respects, and we see no sufficient legal basis for ordering that its obligation in respect of the Credit should be transferred to Penn Central.

Of the decisions of this court cited by the parties, only a few require discussion. Conrail relies on *Stratford Land & Improvement Co. v. Blanchette, supra,* 448 F.Supp. 279. That case dealt with sidetracks constructed by Stratford, pursuant to an agreement whereby Stratford would convey the sidetracks to Penn Central in return for reimbursement of its construction costs of $689,000 at a rate dependent upon the revenue yielded by each car traveling over the new tracks. When these tracks were conveyed by the Penn Central

Trustees to Conrail under the FSP, $431,-490 of this obligation remained to be paid. We did hold that, although the conveyance to Conrail stood Conrail had no obligation to refund Stratford's construction costs, but we did this because Schedule E to the Bill of Sale and Assignment between the Trustees and Conrail expressly excepted all industrial sidetracks agreements or track construction agreements which required the payment of refunds on a per car basis—an exception which we found to be "wholly consistent" with the general scheme of the Rail Act and of the FSP. *Id.* at 282–85. Conrail can point to no similar provision in the conveyance documents expressly excepting the Credit from transfer, even though certain agreements between Penn Central and the transportation authorities of several states were specifically excepted from conveyance. What might have happened if Conrail had presented the point now urged to the USRA in 1976 is mere speculation. More nearly analogous to this case is *Consolidated Rail Corp. v. Penn Central Corp.*, 543 F.Supp. 457 (Regional Rail Reorg. Ct. 1982), where Penn Central made a 20-year lease for the use of rolling stock and equipment that called for the lessor to sell the cars and equipment at the end of the lease term and divide the proceeds among itself, a financing party and Penn Central. Penn Central's interest in this lease was conveyed to Conrail. Penn Central claimed that its right to part of this payment had already accrued and was not conveyed. We declined to divorce the right to share in the proceeds from the sale of rolling stock and equipment from the rolling stock and equipment itself. *Id.* at 459–61. The other cases relied upon by Conrail, *In re Regional Rail Reorganization Proceedings (VRD), supra,* 421 F.Supp. 1076, and *Metro-North, supra,* 598 F.Supp. 1571, dealt with questions too remote from the issue here presented to warrant detailed distinction.

The motions for summary judgment of Penn Central and the transportation authorities are granted and Conrail's motion is denied.