598 F.Supp. 1571 (1984)
CONSOLIDATED RAIL CORPORATION, National Railroad Passenger Corporation, Plaintiffs,
v.
METRO-NORTH COMMUTER RAILROAD COMPANY, Metropolitan Transportation Authority, and Connecticut Department of Transportation, Defendants,
v.
UNITED STATES of America, Counterclaim Defendant.
Civ. A. No. 83-14.
Special Court, Regional Rail Reorganization Act.
November 23, 1984.
*1572 Ralph G. Wellington, Margaret S. Woodruff, Philadelphia, Pa. (Jerome J. Shestack, Schnader, Harrison, Segal & Lewis, Bruce B. Wilson, Donald A. Brinkworth, Philadelphia, Pa., of counsel), for plaintiff, Consolidated Rail Corp.
Stephen C. Rogers, Peter S. Craig, Paul F. Mickey, Jr., David J. Carol, Washington, D.C., for plaintiff, National Railroad Passenger Corp.
Robert M. Lustberg, Walter E. Zullig, Jr., Steven Polan, General Counsel, Metropolitan Transportation Authority, New York City, for defendants, Metropolitan Transp. Authority and Metro-North Commuter Railroad Co.
Robert R. Prince, Mark S. Shipman, Schatz & Schatz, Ribicoff & Kotkin, Stamford, Conn., for defendant, Connecticut Dept. of Transp.
Richard K. Willard, Acting Asst. Atty. Gen., Michael F. Hertz, Alan E. Kleinburd, Attys., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for counterclaim defendant, United States of America.
Robert S. Burk, Acting General Counsel, Kathleen V. Gunning, Washington, D.C., for intervenor, Interstate Commerce Commission.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
FRIENDLY, Presiding Judge:
The plaintiffs in this action are Consolidated Rail Corporation (Conrail) and National Railroad Passenger Corporation (Amtrak). The defendants are Metro-North Commuter Railroad Company (Metro-North), Metropolitan Transportation Authority (MTA), and Connecticut Department of Transportation (CDOT). Metro-North and MTA are public benefit corporations of the State of New York; CDOT is *1573 an agency of the State of Connecticut, acting at all times relevant to this proceeding through the Connecticut Transportation Authority (CTA). In a counterclaim the defendants have impleaded the United States as a defendant.

The Facts
The controversy concerns trackage rights reserved by the Trustees of the Penn Central Railroad in certain sale and lease agreements with MTA and CTA dated October 27, 1970 and June 1, 1972. Plaintiffs contend these rights have devolved upon them and remain in full force and effect. Defendants' primary contention is that they lapsed when Conrail, on January 1, 1983, ceased to furnish the commuter services over the railroad lines on which the trackage rights were reserved which were provided for in agreements entered into simultaneously with the purchase and lease agreements.
The rail lines involved in this controversy were originally owned by the New York Central and the New Haven railroads and became part of the Penn Central as a result of the Pennsylvania-New York Central merger and the compelled inclusion of the New Haven. The former New York Central lines start from Grand Central Station in New York City, proceed under or over Park Avenue to the north, and cross the Harlem River. At Mott Haven in the Bronx the former Hudson Division diverges to the west and proceeds north to Poughkeepsie and Albany, whence the former main line of the New York Central continues to the west over what had been known as the Central's Water Level Route. The former New York Central Harlem Division line proceeds east from Mott Haven to Woodlawn Junction, New York. There it diverges to the north, serving many suburban communities as far as Dover Plains, New York; the former New Haven line proceeds from Woodlawn Junction to the east. At Shell Interlock, near New Rochelle, New York, it is joined by the former Pennsylvania line coming from Pennsylvania Station in New York over the Hell Gate Bridge. The former New Haven line crosses the New York-Connecticut border just east of Port Chester, New York, and proceeds to New Haven, other points in Connecticut and ultimately to Boston. The lines from Washington, Baltimore and Philadelphia to Pennsylvania Station, and thence to Shell Interlock and beyond New Haven to Boston are owned or leased by Amtrak.
On November 25, 1969, Penn Central Transportation Company, MTA and CTA signed a Memorandum of Intent, 29 pages in length, outlining the business terms of a proposed contractual arrangement among MTA, CTA and Penn Central with respect to Penn Central's New Haven Division West End passenger service (the Service) operating from Grand Central Terminal to New Haven, including the New Canaan, Danbury and Waterbury branches. The memorandum recited the intention of the two agencies, with state and federal aid, to provide new rolling stock and other additions and improvements for the Service. In order to protect the public investment so contemplated and to comply with the conditions of state and federal aid programs, MTA and CTA would "either purchase or lease from Penn Central the railroad rights-of-way upon which the fixed facility improvement work will be done (giving back to Penn Central appropriate trackage rights)." Memorandum of Intent, at 1. They would also lease from Penn Central the Grand Central Terminal (GCT) with its approaches from Woodlawn Junction for $1 a year "and on other terms intended to continue the substance of the arrangement under which the former New Haven Railroad used the terminal and Penn Central's facilities north to Woodlawn, subject to Penn Central's continued right, through the medium of a sublease, to use the terminal and approaches for its operations;" and would lease to Penn Central "all of the rolling stock involved in the program." Id. at 1-2. The Service would be operated under a Service Contract to be entered into between MTA and CTA, on the one hand, and Penn Central, on the other, under which Penn Central would commit itself *1574 "for the term of the arrangement (5 years, renewable at MTA/CTA option) to refrain from utilizing the train discontinuance procedures of the Interstate Commerce Act with respect to the Service." Id. at 2. The Memorandum elaborated on this under four headings:
I. MTA Purchase of Former NHRR Transportation Properties in New York State
II. CTA Lease of Former NHRR Transportation Properties in State of Connecticut
III. Lease of Grand Central Terminal Access to MTA
IV. Service Contract
There is no need to go into further detail about the Memorandum, which was executed as a basis for securing regulatory approvals, since it was superseded by the more detailed agreements dated October 27, 1970.
The first of these was the MTA Purchase and Lease Agreement between MTA and the reorganization trustees of Penn Central. Its essential provisions were as follows:
1) MTA was to pay Penn Central $7,200,000, and Penn Central was to convey to MTA all properties comprising the main line of the New Haven between Woodlawn Junction and the New York-Connecticut border by a deed substantially in a form attached. § 201.
2) In the deed Penn Central was to "reserve those trackage rights required by it to operate its railroad common carrier passenger and freight service over the properties conveyed therein to MTA thus permitting Penn Central to operate the Service as well as to continue its non-suburban passenger and freight operations." § 301.
3) Penn Central's utilization of the reserved trackage rights was to be limited to levels set forth in an appendix, but MTA would consent to usage in excess of those levels provided this did not unduly interfere with the Service. §§ 302, 303.
4) Penn Central promised to pay MTA a reasonable charge for all electric power used by it in its exercise of the reserved trackage rights, a fair and reasonable charge for any additional non-Service operations in excess of those specified levels to which MTA might consent, and, commencing 60 years after the date of the agreement, a fair and reasonable charge for the reserved trackage rights. § 401.
5) If a major structural repair was required, MTA or CTA had the right to terminate the Service Contract on 30 days notice. § 702.
The form of deed from the Penn Central Trustees to MTA made a reservation of trackage rights consistent with the provisions of the Purchase and Lease Agreement.
The second agreement, styled the CTA Lease Agreement, was between the CTA and the Penn Central Trustees. It provided that Penn Central would lease to CTA all properties of the former New Haven Railroad between the New York-Connecticut boundary, on the one hand, and New Haven, Waterbury, Danbury and New Canaan, on the other, for a term of 60 years, at a quarter-annual rental equal to 1¼% of the average Aggregate Appraisal Value for such quarter, see § 201, and that so long as the lease remained in effect, CTA had an option to purchase any of the leased properties at the appraisal value. § 202. It contained provision for Penn Central's reservation and utilization of trackage rights without any payment for 60 years save for charges for excess utilization and electric power similar to those provided for in the MTA Purchase and Lease Agreement.
The third agreement was entitled the GCT Joint Facilities Agreement. It provided that MTA/CTA should have a defined basic Service access to GCT, and an additional Service access so long as this did not "unduly interfere with Penn Central's other railroad services which use the trackage between Woodlawn Junction and GCT ... or materially increase the costs of operating Penn Central's other railroad services into GCT." § 202. Of some significance to the present controversy is a provision, *1575 § 301, which established different payment procedures for GCT's net operating revenues and expenses "so long as the Service Contract remains in effect." The term of the agreement was to be 60 years.
The fourth agreement was a Service Contract between CTA and MTA, on the one hand, and the Penn Central Trustees, on the other. Penn Central agreed to operate a commuting service between GCT and points in Connecticut detailed in an appendix at Service fares set forth in another appendix, all of which MTA/CTA had the right to amend subject to the limitations on access to GCT specified in the GCT Joint Facilities Agreement. MTA and CTA were to lease to Penn Central equipment specified in a further appendix. All profits of the Service were to inure to and all losses to be borne equally by MTA and CTA. Penn Central was to receive only a $100,000 annual fee "[a]s compensation for its contributed expertise." § 407. So long as neither CTA nor MTA was in default Penn Central would not exercise its rights under § 13a of the Interstate Commerce Act, 49 U.S.C. § 13a, to discontinue any Service trains. The term of the agreement was to be five years but MTA/CTA had the right to renew this for 11 additional consecutive five year terms. MTA and CTA each had the right to terminate the agreement on 18 months' notice. Any party had the right to terminate for failure of another to cure a default or when granted such right under any of the three other agreements. Upon expiration or termination Penn Central was to pay MTA and CTA each $150,000 for materials and supplies. Also MTA/CTA had "the right to substitute another carrier to operate the Service and Penn Central [had to] surrender without further compensation its right to operate the Service to such substituted carrier." § 706. Absent such substitution, the full responsibility for the operation of the Service would remain with Penn Central.
We turn now from the West End to the Harlem-Hudson properties. These were dealt with preliminarily in a Letter of Intent dated October 12, 1970 and definitively in a Harlem-Hudson Lease Agreement dated June 1, 1972 between MTA and the Penn Central Trustees.
The Lease Agreement provided for a 60 year lease, with a provision granting MTA an option to renew for six additional consecutive five year terms, by the Trustees to MTA of the GCT buildings, of Penn Central's transportation properties used in its suburban passenger service from GCT including the Harlem River lift bridge and the property north of the bridge to Poughkeepsie, New York, on the Hudson Division, and to Dover Plains, New York, on the Harlem Division. The lease was subject to existing leases and agreements, including an agreement dated April 16, 1971 between the Trustees and Amtrak. The lease reserved "all rights necessary to enable [Penn Central] to perform its obligations, and National Railroad Passenger Corporation to exercise its rights, under the Amtrak Agreement." Harlem-Hudson Lease, at 3. In accordance with Article III of the Agreement, the lease also reserved to Penn Central "the right, ... (A) to operate upon the leased premises (the "Trackage") a railroad common carrier service to the extent (i) authorized under the Interstate Commerce Act, or any future law of like import, or (ii) otherwise permitted by law, including the right: (a) to operate over the Trackage freight trains, cars and locomotives; (b) to provide through and local freight service ...; (c) to operate long-haul (through) passenger trains, cars and locomotives ... to and from points north of Poughkeepsie or Dover Plains, New York, through or via Poughkeepsie or Dover Plains, over the Trackage ... [and,] (d) to operate over the Trackage suburban railroad passenger services, as they may from time to time be constituted." Id. at 3-4. The agreement contained provisions as to the level of operations over the Trackage (other than Penn Central's Harlem-Hudson Service and its New Haven Service) similar to those in the West End Agreements.
The Harlem-Hudson Service Agreement was quite similar to the West End Service Contract. Penn Central was to operate suburban passenger service in a quantity *1576 and at fares specified by MTA, which was to lease certain of the equipment used in the Service. All income should inure to and deficits be borne by MTA. Penn Central was to receive an annual fee of $125,000. The term of the agreement was five years, but MTA had the right to renew for up to 17 additional five-year terms. MTA had the right to terminate the agreement at any time on 18 months' notice except that during the initial five year term it might not do this without substituting another carrier. Either party could terminate for uncured defaults or when granted such rights by the Lease Agreement or upon the expiration of the Lease or the Lease Agreement. In the event of expiration or termination of the agreement, MTA had the right to substitute another carrier for Penn Central. If it did not do so, the full responsibility for operating the Service remained with Penn Central.
After the agreements became effective, the Penn Central Trustees operated the Service as contemplated by the West End and Harlem-Hudson Agreements, and exercised the reserved trackage rights, making no payments therefor except as stipulated.
Section 303(b)(2) of the Rail Act preserved the West End and Harlem-Hudson Agreements by providing that the conveyances to be ordered by this court should be
"subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided on January 2, 1974 ....", this being the effective date of the Rail Act. 45 U.S.C. § 743(b)(2).
The Final System Plan (FSP), Vol. I, p. 264, as amended by the Official Errata Supplement, p. 14, designated to Conrail the following properties of Penn Central as transferor:
Trackage rights reserved by transferor for freight and passenger service under the West End Agreement with the Connecticut Transportation Authority and Metropolitan Transportation Authority.
Trackage rights reserved by transferor for freight and passenger operations under the Hudson/Harlem lease agreement and an operating easement in all properties used exclusively for freight service on lines covered by the agreement.
Section C of the FSP designated to Conrail for purchase, lease or other acquisition by Amtrak various properties in the Northeast Corridor (NEC),[1] including:
Such trackage rights of transferors which are necessary to operate Amtrak services on rail lines which have been purchased or leased by public authorities.
1 FSP, at 323. Since only the "intercity" trackage rights were necessary to operate Amtrak services on the West End segment of the NEC, Conrail retained the "commuter" and "freight" trackage rights. After the conveyances on April 1, 1976, Conrail, in accordance with § 303(b)(2) of the Rail Act and the provisions of 1 FSP 45, provided the commuting services which Penn Central had furnished under the West End and Harlem-Hudson Agreements.[2] Conrail *1577 and Amtrak continued to exercise the trackage rights reserved in those agreements for freight and long distance passenger service.
In 1981 Congress adopted the Northeast Rail Service Act of 1981 (NRSA). Section 1133(2) declared one of the purposes of Congress to be a "transfer of Conrail commuter service responsibilities to one or more entities whose principal purpose is the provision of commuter service." 45 U.S.C. § 1102(2). Section 1136 provided:
Notwithstanding any other provision of law or contract, Conrail shall be relieved of any legal obligation to operate commuter service on January 1, 1983.
45 U.S.C. § 744a. Section 1137 added to the Rail Passenger Service Act (RPSA) a new Title V entitled Amtrak Commuter Services. Section 501 directed the establishment of a wholly-owned subsidiary of Amtrak to be known as Amtrak Commuter Services Corporation (Amtrak Commuter). Section 504 provided in relevant part:
(a) Amtrak Commuter is authorized to operate commuter service under an agreement with a commuter authority. Effective January 1, 1983, any commuter service operated by Amtrak Commuter under an agreement with a commuter authority shall be operated solely pursuant to the provisions of this section.
(b)(1) Amtrak Commuter shall operate commuter service which Conrail was obligated to provide on the effective date of this title under section 303(b)(2) or 304(e) of the Regional Rail Reorganization Act of 1973, and may operate any other commuter service, if the commuter authority for which such service is to be operated offers to provide a commuter service operating payment which is designed to cover the difference between the revenue attributable to the operation of such service and the avoidable costs of operating such service (including the avoidable cost of any capital improvements necessary to operate such service) together with a reasonable return on the value.
* * * * * *
(f) Amtrak Commuter shall not be subject to any lease or agreement with a commuter authority under which financial support was being provided on January 2, 1974, for the continuation of rail passenger service, except that the Corporation and Conrail shall retain appropriate trackage rights (for passenger and freight operations respectively) over any rail properties owned or leased by such commuter agency. Compensation for such trackage rights shall be just and reasonable.
(g) Notwithstanding any other provision of this section, Amtrak Commuter is not obligated to provide commuter service if a commuter authority operates the service itself or contracts for the provision of such service by an operator other than Amtrak Commuter. In any such case, Amtrak Commuter shall, where appropriate, provide the commuter authority or such other operator with access to rail properties needed to operate such service.
45 U.S.C. § 584. Section 506 provided that not later than April 1, 1982, each commuter authority shall notify Amtrak Commuter and Conrail whether it intends to operate its own commuter service or to contract with Amtrak Commuter for the operation of such service. Other provisions of the section detail how agreements shall be made between Conrail and either Amtrak Commuter or a commuter authority for the *1578 transfer to one or the other of all of Conrail's commuter services in the Northeast Corridor and any rail properties useful for the operation of the commuter services, such transfer to occur not later than January 1, 1983.
MTA and CTA elected not to accept the service of Amtrak Commuter. Instead MTA organized a wholly-owned subsidiary, Metro-North Commuter Railroad Company (Metro-North). Commencing January 1, 1983, Conrail, in compliance with § 1136 of NRSA but over the objection of MTA and CDOT, ceased operating the Harlem-Hudson and New Haven commuter services, which have been operated since that date by Metro-North. However, Conrail and Amtrak have continued to exercise the trackage rights, largely free up to a certain level of service, provided in the MTA Purchase and Lease Agreement, the CTA Lease Agreement, and the Harlem-Hudson Lease Agreement. MTA and CDOT challenged their right to such free exercise and demanded the payment of a reasonable fee.
In consequence, Conrail and Amtrak brought this action against Metro-North, MTA and CDOT, seeking a declaration that the trackage rights reserved in the West End and Harlem-Hudson Agreements continued in effect. The defendants filed an answer seeking dismissal of the complaints. They also asserted counterclaims against the plaintiffs and against the United States as an impleaded defendant. These counterclaims requested declarations that from and after January 1, 1983, neither Conrail nor Amtrak had any right to use the rail lines here in question save as such rights may have been created by § 504(f) of the Rail Passenger Service Act, quoted above; that if this court finds that such rights were created, plaintiffs and the United States are liable to defendants for the payment of just compensation for such use; and that the court should establish a methodology for the computation of such compensation. The counterclaims also sought a declaration that the creation of any trackage rights by § 504(f) of RPSA was an act of eminent domain for which the United States was bound to pay just compensation.
Conrail has moved for summary judgment that the above described trackage rights remain unchanged and fully enforceable "including their use without compensation by Conrail subject to the terms and levels in [the West End and Harlem-Hudson] agreements, and were not altered or abrogated by Section 1137 of the Northeast Rail Service Act of 1981, which amended Section 504(f) of the Rail Passenger Service Act, or by the assumption of commuter rail service by MTA and CDOT as of January 1, 1983." Amtrak has moved for summary judgment seeking a similar declaration with respect to trackage rights for intercity passenger service over the West End lines.[3] Defendants have moved for summary judgment dismissing the complaints and granting the relief sought in the counterclaims. The United States has moved to dismiss the counterclaims against it. Briefs have been submitted and the court has heard argument.

DISCUSSION
In opposing plaintiffs' motions for summary judgment and supporting their own, defendants rely on two separate although related arguments. The first is that, as a matter of contract interpretation, Penn Central's reservation of what for simplicity we shall call free trackage rights was dependent on its performance of the obligation to provide commuter service under what the defendants contend to have been terms advantageous to them and was therefore lost when Penn Central's successor, *1579 Conrail, abandoned that service in compliance with § 1136 of NRSA on January 1, 1983. The other is that § 504(f), quoted above, which was added to the Rail Passenger Service Act by NRSA, contemplates the payment of compensation for the trackage rights or that if it does not, there was a taking of trackage rights by Conrail, Amtrak, or the United States for which this court should award compensation under § 1152(a) of NRSA.[4]

I
Defendants contend that their losses from having to furnish the commuter services themselves rather than having them supplied by Conrail, even on a fully subsidized basis, are very substantial. First, they claim they were entitled to a $1.837 million dollar annual credit from Conrail under the GCT Joint Facilities Agreement and to an annual credit for approximately 4½% of certain administrative costs attributable to passenger train service into GCT from both the Harlem-Hudson and West End lines, which are no longer being paid. Second, they claim to have lost the benefit of significant economies of scale when Conrail ceased to provide administrative services for the commuter service and the agencies had to furnish the needed services themselves. Metro-North estimates that this has increased annual costs by approximately $11 million in the areas of data processing, accounting, purchasing, and labor management alone. Third, the transportation authorities claim to be disadvantaged by the necessity of financing Metro-North's operating deficit on a current basis, rather than financing Conrail's deficit on a quarterly arrears basis as required by the Service Contracts. Finally, they assert that since Conrail is no longer obligated to maintain the New Haven right-of-way for commuter service, the responsibility has fallen to them. Conceding that under the Service Contracts they were obligated to reimburse Conrail for such maintenance, they claim it is an additional burden to be required not only to pay for the maintenance but also actually to perform it. Plaintiffs neither admit nor deny the accuracy of these figures and we express no opinion about them. Plaintiffs' contention is rather that the entire issue of whether the defendants have suffered a loss as a result of termination of the Service Contracts is irrelevant to the continued existence of their free trackage rights.
Plaintiffs rest their case on what they consider to be the plain language of the reservation of trackage rights in the deed executed pursuant to the MTA Purchase and Lease Agreement, in the lease executed pursuant to the CTA Lease Agreement, and in the lease executed pursuant to the Harlem-Hudson Lease Agreement. The language governing the reservation of trackage rights is indeed unequivocal and without conditions, precedent or subsequent. They fortify this argument by pointing to clauses in the lease and purchase agreements specifying that particular provisions shall apply only so long as the Service Contract for the same rail property is in effect;[5] in contrast there is no such linkage either in the contract provisions or in the deed or leases reserving the free trackage rights.[6] The language being *1580 entirely plain, plaintiffs perceive no justification for resorting to extrinsic evidence, although they maintain that in fact such evidence would operate in their favor, as developed below.
Defendants' chief response to this is that, as evidenced by the Letter and Memorandum of Intent and cross-references in the various contracts, the agreements were a "package deal", so that a serious breach of any would avoid them all. Conceding the interrelationship as they must, plaintiffs answer that the contracts were carefully drawn and that when breach or lapse of one agreement was to affect another, the draftsmen said so, see note 5 supra; they point out further that defendants are not seeking a complete rescission of the agreements but wish to retain the conveyed fee and leasehold interests from which the trackage rights were carved, while excising those rights. They rely also on representations made by the Penn Central Trustees to Penn Central's reorganization court, with defendants' knowledge, that an important consideration to Penn Central for its lease of the Harlem-Hudson properties was its receipt of free trackage rights for 60 years, see Plaintiffs' Jt.App., Exhibit 10, at 3. Moreover, in a deposition in the valuation proceedings before this court, Robert R. Prince, then secretary and general counsel of MTA and formerly its chief negotiator for the West End Purchase and Lease Agreement and Service Contract, stated that Penn Central had been demanding $14 million for the properties conveyed by the MTA Purchase and Lease Agreement and had been induced to reduce this to $7.2 million by an argument of MTA that the capitalized value of the reserved trackage rights amounted to some $6 million. See Plaintiffs' Jt.App., Exhibit 5, at 136-40. Defendants attempt to answer that the dominating interest of Penn Central was to rid itself of the deficit laden commuter operations and that the precise sale or rental price was a matter of small consequence.
Recognizing the limitations on the "plain meaning" rule, see Pacific Gas & Electric Co. v. G.W. Thomas Drayage & R. Co., 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644 (Calif.1968) (Traynor, J.); Restatement of Contracts 2d & Reporter's Note, comment b, we think this is preeminently a case for applying it. The contracts were drawn with meticulous care, providing for contingency after contingency. If the draftsmen had intended that Penn Central's free trackage rights should cease in the event of a default by it with respect to the Service Contracts, they would have said so. In fact, as we have noted, certain provisions of the West End Purchase and Lease Agreements and of the Harlem-Hudson Lease Agreement are expressly conditioned on the continuance of the Service Contracts, see note 5 supra. The failure of the draftsmen to condition the reservation of trackage rights in a similar fashion affords strong proof that the parties did not so intend. Construction of the contract in accordance with its terms produces no harsh or unjust result. The transportation authorities continue to enjoy the fee and leasehold interests granted by the Purchase and Lease Agreements, and plaintiffs retain the trackage rights reserved to them. It is not likely that draftsmen who took care of many small contingencies would have failed to provide that a default under the Service Contracts would terminate the reserved trackage rights, if that had been their intent. Under the agreements as drawn, repudiation of the Service Contracts by Penn Central would have given the transportation authorities a cause of action for damages but would not have affected Penn Central's exercise of free trackage rights any more than a failure of the transportation authorities to *1581 make subsidy payments for the commuter services would have entitled Penn Central to rescind the sales and leases.

II
Any difficulty in this case arises from § 504(f) of the Rail Passenger Service Act, as added by § 1137 of NRSA. It is worth quoting this again:
(f) Amtrak Commuter shall not be subject to any lease or agreement with a commuter authority under which financial support was being provided on January 2, 1974, for the continuation of rail passenger service, except that the Corporation and Conrail shall retain appropriate trackage rights (for passenger and freight operations respectively) over any rail properties owned or leased by such commuter agency. Compensation for such trackage rights shall be just and reasonable.
45 U.S.C. § 584(f).
Plaintiffs would have us dismiss § 504(f) on the simple ground that the section would apply only if defendants had sought to have commuter service furnished by Amtrak Commuter. Since they did not, deciding rather to furnish the service themselves, as, we understand, all commuter authorities did, plaintiffs argue that § 504(f) has no bearing on this case. Defendants respond that if the first sentence had been broken into two, with a period replacing the words "except that", § 504(f) would have conveyed an intention that Amtrak and Conrail should pay just and reasonable compensation for retained trackage rights and that the words "except that" make no sense anyway since the retention of trackage rights is not an exception to the freeing of Amtrak Commuter from obligations under the Service Contracts. Putting the argument in another way, the objective of the first clause of the first sentence was to free Amtrak Commuter from any burdensome service agreements made by a commuter authority with Conrail. There was no need to extend similar protection to a commuter authority which decided to undertake the service itself, since such action would bring any service agreement with the previous provider to an end. On the other hand, Congress wished to be sure that Amtrak and Conrail retained necessary trackage rights over properties that had been sold or leased to commuter authorities, whether the authorities selected Amtrak Commuter or operated the service themselves. In either event Congress intended that the trackage rights should be paid for.
As we explained in a previous opinion where we recounted the story, the legislative history of NRSA is unusual, see Railway Labor Executives' Ass'n v. SEPTA, 534 F.Supp. 832, 844 n. 14 (1982). Section 504(f) had no counterpart in S. 1100, the original version of the Northeast Rail Service Act, introduced by Senator Packwood. However, the bill reported by the House Committee on Energy and Commerce, H.R. 3559, see H.R.Rep. No. 97-153, 97th Cong., 1st Sess., contained a section 504 similar to that finally enacted in some respects but different in others. Notably § 504(g) of the bill, the counterpart of § 504(f) of the act, read as follows:
(g) If a commuter authority fails to offer a commuter service operating payment pursuant to subsection (b)(2) of this section, then any lease or agreement under which financial support was being provided on January 2, 1974, for the continuation of rail passenger service shall not apply to Amtrak Commuter, but the Corporation and the Consolidated Rail Corporation shall retain appropriate trackage rights (for freight and passenger operations respectively [sic]) over any rail properties owned or leased by such commuter agency. Compensation for such trackage rights shall be fair and equitable.[7] *1582 H.R. 3559, 97th Cong., 1st Sess. (1981). The Committee Report elaborated somewhat on this:
Subsection (g) provides that if no commuter service operating payment is offered by a commuter agency pursuant to a lease or agreement, such lease or agreement shall not apply to Amtrak Commuter. In such event, Amtrak and Conrail are to retain appropriate trackage rights for passenger and freight operations over any rail properties owned or leased by such commuter agency. Compensation for such trackage rights is to be fair and equitable. In particular, compensation for freight operations should take into account industry-wide average compensation for freight trackage rights and any additional costs imposed on the commuter agency as a result of freight operations over passenger lines.
H.R.Rep. No. 97-153, supra at 23 (1981). The subsequent legislative history sheds no light on why the language of the House bill was changed.[8]
However, even if we were to engage in the dubious course of reading § 504(f) as having the same meaning as § 504(g) of the House bill, we would not agree that Congress imposed a liability on Conrail and Amtrak to pay for the free trackage rights reserved in the West End and Harlem-Hudson Agreements. Whatever realism there might or might not be in assuming that the concerned members of Congress were aware of the provisions of the FSP designating the trackage rights held by Penn Central to Conrail and Amtrak, it would be pressing too far to believe that even such members were aware of how long such rights endured or that Penn Central was not obliged to make payment for them to the transportation authorities up to a certain level of use. What Congress desired to make clear was that its freeing of Amtrak Commuter from the obligations of the West End and Harlem-Hudson Agreements, to which Conrail had been made subject by the Rail Act, should not deprive Amtrak and Conrail of trackage rights needed for the operation of their respective passenger and freight services. The direction, "Compensation for such trackage rights shall be just and reasonable," should be read as applying only when compensation is due; if a person is legally entitled to use something free, requiring him to pay any compensation is not "just and reasonable". We can think of no reason why Congress, which was looking forward to a sale of Conrail, see 45 U.S.C. § 761(a), should have wished to impose costs on Conrail that it had no obligation to bear. We have been cited to nothing to indicate that the defendants made known to the Congress that enacted NRSA their present position that freeing Conrail from its obligations under the Service Contracts would be detrimental to them. On the contrary Congress had every reason to believe that all the commuter agencies were as glad to get rid of Conrail as Conrail was to be free of responsibility to them. As said in the House report, supra, at 11:
The commuter agencies (along with Conrail and Amtrak) contend that labor costs are too high and work rules too restrictive. But the institutional arrangements impede those most concerned with coststhe commuter agenciesfrom exercising control over the costs.[9]
We thus conclude that § 504(f) did not impose a statutory obligation on Conrail and Amtrak to pay for what the West End and *1583 Harlem-Hudson Agreements entitled them to retain free.
What we have just said suffices to dispose of defendants' arguments that NRSA constituted a taking of trackage rights over their properties for which we should award compensation under § 1152(a)(4). If NRSA took anything from the defendants, it was not the trackage rights, to which Conrail and Amtrak were entitled as successors to Penn Central, but rather the benefit of Penn Central's Service Contracts which had been imposed upon Conrail. Defendants have not pleaded any such claim and we intimate no view with respect to its merit.
Plaintiffs' motions for summary judgment are granted, and defendants' motions for summary judgment are denied. The motion of the United States to dismiss defendants' counterclaim is granted with leave to the defendants to file, within 20 days from the entry of judgment, an amended counterclaim for the loss of the benefits of the Service Contracts brought about by NRSA. If the parties cannot agree on a form of judgment, this should be settled on ten days' notice.
NOTES
[1] This includes the properties covered by the West End Agreements, with the exception of the segment of track linking Woodlawn Junction with the Shell Interlock, but not those covered by the Harlem-Hudson Agreements.
[2] The defendants point out that the presence of § 303(b)(2) and the related § 304(e)(3) was by no means accidental. The Rail Act, as originally drafted, provided generally that the conveyances from the transferors were to be "free and clear of any liens or encumbrances." S. 2676, 93d Cong., 1st Sess. (1973). Dr. William J. Ronan, then chairman of MTA, brought to the attention of the Senate Committee on Commerce the fear of MTA that this might have the effect of transferring to Conrail some of the properties here at issue which had been leased to MTA and on which it had spent large amounts of money, without any assurance that Conrail would provide commuter service. While MTA would share in a condemnation award for the taking of its property, it was far more interested in the continuation and improvement of commuter service. He therefore urged that the bill be revised "to insure that Metropolitan Transportation Authority's rights under the several leases and agreements embodying our financial support arrangements with Penn Central covering these three lines be respected in any such transfer to the core-system operating company." Hearings on Northeast and Midwest Railroad Transportation Crisis Before the Senate Committee on Commerce, 93d Cong., 1st Sess., at 1000 (1973) (statement of William J. Ronan). When the Committee failed to respond to this suggestion, Senator Javits offered what is now § 303(b)(2) as a floor amendment. 119 Cong.Rec. S40736-37 (daily ed. Dec. 11, 1973) (statement of Sen. Javits). Consistent with this, § 304(e)(3) provided that passenger service under arrangements described in § 303(b)(2) should continue as provided in such arrangements rather than by the general provisions of § 304(c)(2)(A) and (C).
[3] Amtrak concedes that it is not entitled to free trackage rights for intercity passenger service over the line from GCT to Poughkeepsie since this is not within the Northeast Corridor. It has applied to the Interstate Commerce Commission in Finance Docket No. 30426 under 45 U.S.C. § 562(a) to fix appropriate compensation for it to pay MTA for the use of this line. By a Memorandum-Order dated July 23, 1984, we denied a motion by MTA to stay the Commission proceeding. On October 29, 1984, the Commission issued an interim decision upholding its jurisdiction under 45 U.S.C. § 562(a) and directing further proceedings.
[4] That section gives this court original and exclusive jurisdiction over any civil action:

(1) for injunctive, declaratory, or other relief relating to the enforcement, operation, execution, or interpretation of any provision of or amendment made by this subtitle, or administrative action taken thereunder to the extent such action is subject to judicial review;
. . . . .
(4) seeking judgment upon any claim against the United States founded upon the Constitution and resulting from the operation of any provision of or amendment made by this subtitle.
45 U.S.C. § 1105(a).
[5] MTA Purchase and Lease Agreement, §§ 106, 402, 501; CTA Lease Agreement, §§ 402, 501; Harlem-Hudson Lease Agreement, §§ 402, 501.
[6] Plaintiffs make other arguments that are less convincing. They point to the fact that the reservation of free trackage rights was for 60 years whereas the Service Contracts were for only five, ignoring the provisions giving the transportation authorities options to renew the Service Contracts for successive five-year terms aggregating a total of 60 years in the case of the West End Service Contract and 90 years in the case of the Harlem-Hudson Service Contract. They point also to provisions in the Service Contracts that granted the transportation authorities the right to substitute another operator and to terminate the Service Contracts in the event that structural repairs were required. These rights, which rest in the volition of the transportation authorities, are quite different from a breach by Penn Central.
[7] Subsection (b)(2) required Amtrak Commuter to operate commuter service if a commuter authority made a service operating payment pursuant to a lease or agreement under which financial support was being provided on January 2, 1974, for the continuation of rail passenger service. This phrase covered the Service Contracts here at issue.
[8] After the provisions of H.R. 3559 were incorporated verbatim into H.R. 3982, the Omnibus Reconciliation Act of 1981, a House and Senate Conference Committee resolved any differences between the provisions of the bill and those of S. 1377, the Senate version of the Omnibus Budget Reconciliation Act, which had incorporated the terms of S. 1100. The only comment in the Conference Committee Report concerning the changes in what had been § 504(g) of H.R. 3559 is a general statement that "[t]he House and Senate provisions for the transfer of commuter services and related properties are combined." 127 Cong.Rec. S9057 (daily ed. July 31, 1981) (Explanatory Statement of the House and Senate Conferees with Respect to Subtitles E, F, and G of Title XI of the Omnibus Reconciliation Bill).
[9] The report elaborates this in some detail.