792 F.2d 287
 METROPOLITAN TRANSPORTATION AUTHORITY and Metro-North
Commuter Railroad Co., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National Railroad Passenger Corp., Intervenor.
 No. 85-4141.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 16, 1985.
Decided June 4, 1986.
 
 Robert R. Prince, Stamford, Conn. (Robert M. Lustberg, New York City, Walter Zullig, General Counsel, Metro-North Commuter R. Co., New York City, of counsel), for petitioners.
 Louis Mackall, I.C.C., Washington, D.C. (Douglas H. Ginsburg, Asst. Atty. Gen., Dept. of Justice, John J. Powers, III, John P. Fonte, Attys.; Robert S. Burk, General Counsel, ICC, Henri F. Rush, Deputy Gen. Counsel, of counsel), for respondent I.C.C.
 Stephen C. Rogers, Washington, D.C. (Peter S. Craig, Frederick C. Ohly, Washington, D.C., of counsel), for Intervenor Nat. R.R. Passenger Corp.
 Before OAKES, KEARSE, and PIERCE, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This case concerns questions of the applicability and constitutionality of acts of Congress pertaining to certain rail passenger services as well as questions whether the Interstate Commerce Commission (ICC or Commission), respondent here, has jurisdiction to determine the compensation owed by the National Railroad Passenger Corporation (Amtrak), intervenor here, to the New York Metropolitan Transportation Authority (MTA) and its wholly-owned subsidiary Metro-North Commuter Railroad Company (Metro-North) (jointly referred to as Metro), petitioners here, for Amtrak's use of certain facilities and services of the petitioners and whether the determinations that the ICC made were proper. Resolution of these questions involves examination of the tortuous collation of statutes pertaining to Amtrak, including the relevant sections of the Rail Passenger Service Act of 1970 (RPSA), 45 U.S.C. Secs. 501-658 (as amended),[1] and to Metro-North, which by virtue, inter alia, of the Northeast Rail Service Act of 1981 (NRSA), Pub.L. No. 97-35, 95 Stat. 643 (codified as amended in scattered sections of 45 U.S.C.), now operates a commuter rail service formerly operated by the Penn Central Transportation Company (Penn Central), and from 1976 through 1982, by Penn Central's federally-funded successor in interest, Consolidated Rail Corporation (Conrail), which was statutorily constituted pursuant to the Regional Rail Reorganization Act of 1973 (3R Act), Pub.L. No. 93-236, 87 Stat. 985 (codified as amended in scattered sections of 45 U.S.C.).
 
 
 2
 The case also requires our consideration of, among other things, the tortured history by which the seventy-four miles of lines in question between Poughkeepsie, New York, and Grand Central Terminal (GCT) in New York City (the Harlem-Hudson Line), as well as the GCT facility itself, came to be leased originally to MTA by Penn Central in 1972, the latter reserving certain rights, however, to Amtrak and to itself. Penn Central's rights were in turn later assigned in part to Conrail. In our trek through these statutes and this history we are aided no end by the previous opinions of the Special Court, Regional Rail Reorganization Act (the Special Court), 45 U.S.C. Sec. 719(b), which (a) declined to stay the instant Commission proceedings, Consolidated Rail Corp. v. Metro-North Commuter Railroad Co., C.A. No. 83-14 (Regional Rail Reorg. Ct., July 23, 1984) (Conrail I ) (holding (1) section 402(a) of RPSA, 45 U.S.C. Sec. 562(a), facially applicable to Amtrak's trackage rights over the lines in question, (2) a Fifth Amendment constitutional argument insubstantial, (3) section 504(f) of RPSA, added by section 1137 of NRSA, 45 U.S.C. Sec. 584(f), inapplicable, and (4) declining to exercise any power under the All Writs Act, 28 U.S.C. Sec. 1651, in order to preserve its jurisdiction); and (b) in a proceeding related to this one held that the free trackage rights and rights to GCT (collectively "trackage rights") retained by Penn Central in its 1972 leases to MTA devolved upon Conrail and, to a limited extent, upon Amtrak and remain in full force and effect despite Conrail's ceasing as of January 1, 1983, to furnish commuter services on the lines in question and despite the enactment of section 504(f) of RPSA, see Consolidated Rail Corp. v. Metro-North Commuter Railroad Co., 598 F.Supp. 1571 (Regional Rail Reorg. Ct.1984) (Conrail II ). With that aid, as well as with a careful independent examination of the historical facts, statutes, and claims involved, we deny the petition to review.
 
 STATEMENT OF FACTS
 
 3
 Because rail passenger service was deteriorating throughout the nation, Congress enacted the RPSA in 1970. The RPSA created Amtrak and provided for its assumption of nearly all "basic system" intercity passenger service obligations. See Congress of Railway Unions v. Hodgson, 326 F.Supp. 68, 70 (D.D.C.1971). Under section 401 of RPSA, 45 U.S.C. Sec. 561, railroads were permitted to terminate their responsibility to provide intercity rail passenger service without filing an application for discontinuance with the ICC; they could, instead, contract with Amtrak, at least until Amtrak's authority to enter such contracts expired in 1975.
 
 
 4
 Amtrak continues to have authority under section 402 of RPSA, 45 U.S.C. Sec. 562, to "contract with railroads or with regional transportation agencies for the use of tracks and other facilities." If the parties cannot agree, section 402(a), the critical statutory provision involved in this case, gives the Commission the authority, if necessary to accomplish the purposes of RPSA, to prescribe compensation to be paid by Amtrak for the use of such tracks and facilities. That subsection provides that such compensation is in general to be limited to "incremental costs"; the "quality of service" is the principal factor that can lead to an award of compensation in excess of those costs. "Incremental costs," all parties to this case agree, are the same as so-called "avoidable costs," i.e., the costs of the carrier whose facilities are being used that would be avoidable except for Amtrak's use. These are as opposed to "fully-allocated" or "fully-distributed" costs, which are equal to the total costs of maintenance, operation and repair of a line or facilities, and to a return on investment, in basically the same proportion as the respective carriers use the facilities. It is self-evident that Metro wishes to get out from under the application of section 402(a) so that it can receive fully-allocated costs.[2]
 
 
 5
 The relationship that led to the controversy before us can be traced back to 1972, when MTA, which, like its subsidiary Metro-North, is a New York state public benefit corporation, see N.Y.Pub.Auth.Law Secs. 1263(1), 1266(5) (McKinney 1982), entered into an arrangement with Penn Central concerning the latter's Harlem-Hudson service. This arrangement enabled MTA to obtain full control over a substantial part of Penn Central's tracks, terminals, stations, shops, and yards by a single lease, the so-called Harlem-Hudson Lease. The lease covered both GCT and the whole of the Harlem and Hudson Lines. It was for a term of sixty years with various rights of renewal permitting it to run up to an additional thirty years. The rent that MTA agreed to pay Penn Central was nominal, but the agreement made MTA eligible for substantial federal aid and rehabilitation. See 49 U.S.C. app. Sec. 1602(a). Although Penn Central was then in the process of transferring responsibility for its long-haul passenger services to the newly-created Amtrak, it reserved certain rights under the lease, including the right to continue to operate its freight and long-haul passenger services over the leased properties and all rights necessary to enable Penn Central to perform its obligations and Amtrak to exercise its rights under an April 16, 1971, agreement between Amtrak and Penn Central. Penn Central was required to pay MTA if its traffic exceeded a certain level and to pay various other costs. In a separate but simultaneous agreement, MTA contracted with Penn Central to underwrite the latter's losses on its Harlem-Hudson commuter service.
 
 
 6
 In accordance with the Final System Plan (FSP), drafted by the United States Railway Association (USRA) pursuant to section 206 of the 3R Act, 45 U.S.C. Sec. 716, and approved by Congress in section 601(e) of the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), 45 U.S.C. Sec. 718(d)(1) (adding Sec. 208(d) to 3R Act), see Penn Central Corp. v. Consolidated Rail Corp., 611 F.Supp. 285, 291 n.5 (Regional Rail Reorg. Ct.1985), Penn Central's trackage rights and its commitment to provide commuter services were assigned to Conrail on April 1, 1976. The FSP required a scaled-down Penn Central system and compelled Penn Central for value to convey that system to Conrail. The FSP left Penn Central as fee owner of the properties subject to MTA's long-term lease and USRA simply designated Penn Central's Harlem-Hudson trackage rights for transfer to Conrail. On the same day that Conrail received these rights from Penn Central--April 1, 1976--Conrail transferred to Amtrak other long-haul passenger train rights, but not the Harlem-Hudson commuter train rights. Conrail and Amtrak continued to exercise the trackage rights reserved in the Harlem-Hudson Lease for freight and long distance passenger service. See Conrail II, 598 F.Supp. at 1576-77.
 
 
 7
 In 1981 Congress adopted the NRSA. Section 1133(2) of that Act, 45 U.S.C. Sec. 1102(2), provided for the transfer of Conrail's commuter service responsibilities to other entities. Sections 1137 and 1145 of NRSA also added a new title to RPSA, Title V, sections 501-10, 45 U.S.C. Secs. 581-91 (as amended), authorizing the creation of a wholly-owned subsidiary of Amtrak known as Amtrak Commuter Services Corporation (Amtrak Commuter) whose primary function was to provide certain commuter services formerly provided by Conrail. New section 506(a) of RPSA, 45 U.S.C. Sec. 586(a), required each local commuter authority to notify Amtrak Commuter and Conrail by April 1, 1982, whether it intended to operate its own commuter service or to contract with Amtrak Commuter for such service. MTA elected not to use Amtrak Commuter. It instead organized its subsidiary Metro-North, which began operations January 1, 1983, the day that Conrail's commuter service obligations terminated.
 
 
 8
 In Conrail II, which involved questions of the nature of Conrail's and Amtrak's rights and obligations under Penn Central's lease of its West End properties (the New Haven line) and of Conrail's rights and obligations under the Harlem-Hudson Lease into which Penn Central had entered, MTA argued to the Special Court that Conrail lost its free trackage rights when it stopped providing commuter services. MTA maintained that, after January 1, 1983, Conrail and Amtrak had an obligation to contribute their share of the costs of maintenance, operation, and repair of the MTA lines, including GCT. The Special Court held that Penn Central's leases to MTA reserved rights to Penn Central, that, as discussed above, those rights had been assigned to Conrail and Amtrak, and that they were not extinguished by the statutory termination of Conrail's duties to provide commuter services. 598 F.Supp. at 1582-83.
 
 
 9
 This case concerns a matter not at issue in Conrail II: the compensation that Amtrak owes for its use of Harlem-Hudson Line trackage rights and for the use of facilities and services associated with that line. See id. at 1578 n.3. Conrail II involved free trackage rights that had passed from Penn Central to Amtrak and Conrail pursuant to the 3R Act and the FSP. Since the Hudson portion of the Harlem-Hudson Line was not in the Northeast corridor, the 3R Act and the FSP did not give Amtrak free trackage rights over that line. Amtrak does not dispute that it must pay for use of the line. The question is how much.
 
 
 10
 After failing to reach agreement with Metro over compensation for its use of the line and associated services and facilities, Amtrak filed the instant petition before the Commission requesting that compensation be set pursuant to section 402(a) of RPSA, 45 U.S.C. Sec. 562(a). MTA and Metro-North then filed a motion asking the Special Court to enjoin the Commission proceeding. They claimed, as they do here, that section 402(a) does not apply to them, but that if it does that section is unconstitutional, and that the Special Court, not the Commission, has exclusive jurisdiction to fix compensation for trackage rights. The Special Court, as noted above, denied the stay request in Conrail I.
 
 
 11
 The Commission itself has made three decisions on Amtrak's petition, review of which is sought here. The first, dated July 27, 1984, denied Metro's motion to dismiss on the basis that section 504(f) of RPSA, 45 U.S.C. Sec. 584(f), did not preempt Amtrak's option to obtain trackage rights under section 402(a), and it did not bring into effect section 1152(a)(1) of NRSA, 45 U.S.C. Sec. 1105(a)(1), which provides that the Special Court has exclusive jurisdiction "over any civil action" brought pursuant to the provisions of NRSA. Rather, the Commission agreed with Amtrak that, since the petition was not a "civil action," the clear statutory basis for the Commission's jurisdiction over the application was section 402(a) of RPSA. The Commission noted that section 402(a) orders have routinely been reviewed in the United States Courts of Appeals. See, e.g., National Railroad Passenger Corp. v. ICC, 610 F.2d 881 (D.C.Cir.1979).
 
 
 12
 In the Commission's second decision, dated October 25, 1984, it reaffirmed the holding that section 402(a) gives it jurisdiction to set terms for the use of trackage and facilities. In reaching this conclusion, the Commission found that Metro was a regional transportation agency providing rail passenger service. It also rejected the contention that section 402(a) applied only to intercity rail passenger carriers that took advantage of the discontinuance provision of section 401 of RPSA, 45 U.S.C. Sec. 561, and cited its own decision holding otherwise, Penn Central Transportation Co.--Compensation for Passenger Service, 342 I.C.C. 765, 767-68 (1973). The ICC rejected the argument that the transfer of trackage rights to Amtrak under the 3R Act, the FSP, and the 4R Act demonstrates that section 402(a) applies only to intercity rail passenger carriers that terminated service pursuant to section 401. It disposed of Metro's contention that section 402(a) violates the Fifth Amendment by suggesting that 402(a) does not represent a taking since Metro still has a right, albeit non-exclusive, to use its property, and by adding that Metro's claim of unconstitutionality was premature since Metro could secure judicial review after the rate was set. See 28 U.S.C. Secs. 2321(a), 2342(5) (1982 & Supp. II 1984). The Commission also found meritless Metro's claim that only a court can establish constitutionally required compensation, citing Bauman v. Ross, 167 U.S. 548, 593, 17 S.Ct. 966, 972, 42 L.Ed.2d 270 (1897). The Commission also ruled that the Tenth Amendment as interpreted in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), did not make section 402(a) an unconstitutional infringement of state sovereignty rights since it involves matters traditionally entrusted to the federal government, citing United Transportation Union v. Long Island Rail Road Co., 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). It then rejected Metro's attempt to secure compensation retroactively for the period beginning April 1, 1976; the Commission held that under National Railroad Passenger Corp. and Union Pacific Railroad Co., 348 I.C.C. 926, 935-37 (1977), it could not award retroactive compensation for the period before the date on which both parties agreed compensation had begun to be owed, i.e., January 1, 1983. Finally, it held that the proper costing standard to be used was avoidable costs. See Costing Methodologies for the Northeast Corridor: Commuter Service, 367 I.C.C. 192 (1983).
 
 
 13
 The third Commission decision, dated July 5, 1985, prescribed a general methodology for determining compensation but did not calculate the specific dollar amount. The Commission also disposed of a number of specific claims advanced by Metro to secure additional payments. Thus, it found that Metro could not charge Amtrak for the use of space and facilities at GCT since the space and facilities in question were reserved from the Harlem-Hudson Lease, and therefore Metro had no ownership or leasehold rights. The Commission also rejected the argument that, but for the presence of Amtrak, Metro would be able to reduce from four to two the number of tracks on the twenty-nine miles of the Harlem-Hudson Line between Spuyten Duyvil and Croton-Harmon. This holding was based on the finding that Metro had not shown that it had the permission of the lessor Penn Central or the trackage rights user Conrail to make the necessary modifications. The Commission also noted that Amtrak had recently agreed to invest $6 million towards rehabilitation of the four-track system. The Commission also reasserted the propriety of its jurisdiction under section 402(a), stating that it had recently found Metro-North to be a railroad for purposes of 49 U.S.C. Subtitle IV in Metro-North Commuter Railroad Co.--Exemption from 49 U.S.C. Subtitle IV, Finance Docket No. 30063 (Nov. 24, 1982), and hence it is a railroad under section 402(a).
 
 DISCUSSION
 I. Applicability of Section 402(a)
 
 14
 Petitioners make three arguments to the effect that section 402(a) is inapplicable to them: (1) They are not railroads or regional transportation agencies within the meaning of RPSA; (2) section 402(a) applies only to carriers that have avoided their passenger service obligations under section 401, i.e., sections 401 and 402(a) are interdependent; and (3) section 402(a) was superseded by NRSA's addition of section 504(f) to RPSA. Each of these contentions is untenable.
 
 
 15
 Section 103(15) of RPSA, 45 U.S.C. Sec. 502(15), defines a regional transportation agency as an "authority, corporation, or other entity established for the purpose of providing passenger service within a region." MTA surely falls within that definition. Indeed, 45 U.S.C. Sec. 502(8) specifically includes MTA on a list of "[s]tate, local, or regional authorit[ies]" established for the purpose of providing commuter service. Moreover, 45 U.S.C. Sec. 502(9) defines "commuter service" as "short-haul passenger service." Metro-North is also a "railroad" or "rail carrier" as those terms are defined in 45 U.S.C. Sec. 502(14), since it provides railroad service for compensation. It is immaterial to Metro-North's status as a railroad that the Harlem-Hudson Lease is held by MTA and not by Metro-North; both owner and operator are carriers. See Conrail Abandonment in Jeannette, Pa., 366 I.C.C. 384, 387 (1982).
 
 
 16
 The argument that sections 401 and 402(a) are interdependent and that section 402(a) applies only to carriers that terminated service pursuant to section 401 is similarly lacking in merit. The two sections function separately and serve different purposes. Section 401 applies only to railroads, while section 402(a) covers both railroads and regional transportation authorities. Congress did not limit Amtrak applications to the ICC under section 402(a) to those involving railroads that have used section 401, as it easily could have done had it wished to do so. Section 401 provides relief for railroads; section 402(a) assures that Amtrak has available necessary facilities to carry out the purposes of RPSA.[3]
 
 
 17
 We also reject the argument that the transfer of rail trackage rights to Amtrak in the 3R Act, the FSP, and the 4R Act demonstrates a congressional belief that the MTA lines did not fall within the coverage of section 402(a). MTA specifically claims that when Congress adopted the 3R Act in 1973 it decided to protect the Harlem-Hudson Lease by having Conrail assume it, section 303(b)(2), 45 U.S.C. Sec. 743(b)(2); that the USRA implemented this decision in the FSP by requiring Conrail to assume the contract; and that the USRA also implemented that decision by designating for transfer to Conrail Penn Central's free trackage rights for long-haul passenger service and freight service. MTA also notes that before the 3R Act's April 1, 1976, conveyance date Congress amended section 206(c)(1)(D) of that act by passing section 607(j) of the 4R Act to permit Congress to pipe through to Amtrak the reserved free trackage rights for long-haul passenger service over the Harlem-Hudson Line and into GCT. See 45 U.S.C. Sec. 716(c)(1)(D) (relevant section as amended). MTA's argument is that, if Amtrak could assert rights under section 402(a) over the property of all rail carriers, then Congress would not have taken these various steps. We think, however, that the USRA and Congress were more concerned with the task of redesigning the freight rail system in the Northeast and implementing the FSP by conveyance of thousands of miles of rail line and related facilities from Penn Central and other bankrupt rail systems to Conrail rather than with the precise relationship of section 402(a) to the designation of trackage rights on the Harlem-Hudson Line and Amtrak's role in respect thereto. Section 402(a) permits, as the Commission pointed out, only a piecemeal approach; the 3R Act, the FSP, and the 4R Act represented an effort to resolve a crisis in rail transportation in the Northeast Corridor through major restructuring. Congress neither amended nor repealed section 402(a) after the restructuring accomplished by the 3R Act, the FSP, and the 4R Act, and the section continues to play a necessary role in facilitating Amtrak's operations.
 
 
 18
 The petitioners make a complex argument in respect to section 1137 of NRSA, which added section 504(f) to RPSA, 45 U.S.C. Sec. 584(f). That subsection is set forth in the margin.[4] MTA claims that section 504(f) "inescapably" refers only to the financial support arrangements pertaining to the Harlem-Hudson and New Haven Lines and that it indicates that Congress intended Amtrak and Conrail to have and enjoy a trackage right not limited in time over MTA leaseholds included in those arrangements. MTA maintains that an "[e]qually inescapable" conclusion is that for these easements MTA was to be paid "just and reasonable" compensation, not limited to reimbursement of its incremental costs, and that the Commission was to play no part in determining the amount of the compensation, cf. Lehigh & New England Railway Co. v. ICC, 540 F.2d 71, 78 (3d Cir.1976) (Commission's regulatory jurisdiction statutory only), cert. denied, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). MTA contends that Congress would not have created a trackage right in 1981 for Amtrak's benefit over the Harlem-Hudson Line into GCT if MTA's facilities were already subject to Amtrak's demands for service under section 402(a) of RPSA. The Commission rejected this argument, holding that section 504(f) was intended to come into play only if MTA hired Amtrak Commuter to take over the Harlem-Hudson Commuter Service in place of Conrail, and that since MTA had chosen to create Metro-North to perform that function the subsection was inapplicable. When it refused to enjoin the ICC proceedings, the Special Court implicitly rejected MTA's position that because section 504(f) was controlling the Special Court had exclusive jurisdiction. Section 504(f) was discussed in depth in Judge Friendly's opinion for the Special Court in Conrail II:
 
 
 19
 What Congress desired to make clear was that its freeing of Amtrak Commuter from the obligations of the ... Harlem-Hudson Agreement[ ], to which Conrail had been made subject by [the 3R Act], should not deprive Amtrak and Conrail of trackage rights needed for the operation of their respective passenger and freight services. The direction, "Compensation for such trackage rights shall be just and reasonable," should be read as applying only when compensation is due; if a person is legally entitled to use something free, requiring him to pay any compensation is not "just and reasonable."
 
 
 20
 598 F.Supp. at 1582. The Special Court then went on to conclude that section 504(f) "did not impose a statutory obligation on Conrail and Amtrak to pay for what the ... Harlem-Hudson Agreement[ ] entitled them to retain free." Id. at 1582-83.
 
 
 21
 Nevertheless, petitioners say that Amtrak by its own admission has no contractual rights to use the Harlem-Hudson Line or GCT, for if it had it would not have instituted this proceeding; therefore, MTA argues, section 504(f) applies to Amtrak's use of those facilities. But we agree with the Commission and with Amtrak that section 504 only comes into play if the commuter authority such as MTA contracts with Amtrak Commuter to replace the previous service rendered to it by Conrail. See 45 U.S.C. Sec. 584(a), (g) (authorizing either Amtrak Commuter or alternative commuter services). Since MTA did not enter into a contract with Amtrak Commuter, section 504 simply does not apply.
 
 II. Constitutionality of Section 402(a)
 
 22
 Petitioners claim that section 402(a), if it applies to them, is an unconstitutional condemnation act because an administrative agency rather than a court determines the compensation and because the statute ties the agency's hands in determination of that amount. None of the arguments advanced in support of this contention is meritorious.
 
 
 23
 Petitioners cite Monongahela Navigation Co. v. United States, 148 U.S. 312, 327, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893), for the proposition that in eminent domain law determining what compensation is just is a judicial, not a legislative, function. We need not pause long with this argument. In Conrail I, Judge Friendly put it in a nutshell in denying MTA's motion to enjoin the ICC from proceeding in the instant action when he said that this argument of petitioners "does not appear to us to be substantial in light of Thompson v. Texas Mexican Railway Co., 328 U.S. 134, 147-48, 66 S.Ct. 937, 945, 90 L.Ed. 1132 (1946)." Conrail I at 4. In Thompson, one carrier sought to terminate the contractually created trackage rights of another carrier that was undergoing reorganization under section 77 of the Bankruptcy Act. The question before the Court was whether the ICC had exclusive jurisdiction to set rates and to determine whether the trackage agreement should be terminated. Answering both questions in the affirmative, the Court found that Congress in section 7 of the Transportation Act of 1940, see 49 U.S.C. Sec. 5(2)(a)(ii), had given the Commission exclusive jurisdiction to determine the terms and conditions by which trackage rights were acquired and that this delegation was appropriate. See Thompson, 328 U.S. at 146-51, 66 S.Ct. at 944-47. The Court stated,
 
 
 24
 [I]t is one of the Commission's high functions to protect the public interest against unfair or oppressive financial practices which in the past led to such great havoc and disaster. That policy would be undermined if the carriers could repair to courts for determination of the conditions under which trackage rights could be secured.
 
 
 25
 Id. at 148, 66 S.Ct. at 945. While, to be sure, Thompson was not dealing with the Commission's power relative to trackage rights under section 402(a), the logic of that opinion is obviously applicable here. Thompson unquestionably stands for the proposition that the delegation of power to the ICC to set trackage rates, subject to ultimate judicial review, is constitutional.
 
 
 26
 Amtrak also claims that section 402(a) unconstitutionally limits awards to avoidable costs. (We note in passing the irony of a transit authority that obtains a sixty-plus year lease of railroad property at a nominal rate and that, as a result of that lease, receives substantial aid from the federal government claiming that a federal agency is taking its leased property improperly because the compensation the authority receives is limited to avoidable costs.) Petitioners' argument fails for two reasons. In the first place, we agree with Amtrak that proceeding by way of section 402(a) is not a taking. Since Munn v. Illinois, 94 U.S. (4 Otto) 113, 24 L.Ed. 77 (1876), railroad companies have been held subject to regulation so that, for example, a Commission order directing one carrier to receive and transport the cars of a second carrier over its terminal is not a taking, Pennsylvania Co. v. United States, 236 U.S. 351, 369-72, 35 S.Ct. 370, 376-77, 59 L.Ed. 616 (1915); requiring railroads to disgorge half of their income in excess of 6% of the value of their property is not a taking, Dayton-Goose Creek Railway Co. v. United States, 263 U.S. 456, 484, 44 S.Ct. 169, 174, 68 L.Ed. 388 (1924); and imposing a ceiling on particular rates is not a taking so long as it does not cause the railroad to lose money on its overall business, Baltimore & Ohio Railroad Co. v. United States, 345 U.S. 146, 148, 73 S.Ct. 592, 593, 97 L.Ed. 912 (1953). While concededly what is a taking is an ad hoc factual inquiry, see Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979); Oakes, "Property Rights" in Constitutional Analysis Today, 56 Wash.L.Rev. 583, 622 (1981), requiring one public utility to give another operative rights over its facilities, subject to an obligation to pay reasonable reimbursement, in order to deliver service to the public--as in the case of wheeling power from one point to another over one power company's transmission lines for another power company's benefit, see Federal Power Act, 16 U.S.C. Secs. 824j, 824k--fits more into the regulatory rather than the taking mode as those terms have traditionally been applied by American courts. Rather than to cite us to Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), as the Commission has done in its brief, perhaps it should have referred us to Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928). Or if we look at the "investment backed expectations" language of some of the recent Supreme Court cases, e.g., Kaiser Aetna, 444 U.S. at 175, 100 S.Ct. at 390, it is hard to imagine that when MTA, a public authority, leased the Harlem-Hudson Line at a minimal investment it had any expectation that it could preclude its lessor or those holding rights reserved by the lessor from exercising the reserved trackage rights. In other words, MTA's reasonable investment expectations have hardly been so frustrated as to amount to a taking.
 
 
 27
 The second reason that Metro's argument here fails is that, assuming arguendo that there has been a taking, compensation is adequate since MTA, in obtaining avoidable costs, will receive what it would have had but for the taking. Cf. Chicago & North Western Transportation Co. v. United States, 678 F.2d 665, 668 (7th Cir.1982). In other words, the owner, here the lessee, of the railroad facilities will be put into the same position monetarily as it would have occupied if the property had not been taken, and this is precisely the guiding principle of what is just compensation. United States v. Reynolds, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970); United States v. Virginia Electric & Power Co., 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961). Perhaps the whole taking argument can be dismissed with the comment that MTA and Metro-North really wish to seek to have Amtrak share with them the overhead costs of "ownership." If the Fifth Amendment required such a sharing, they would be put in a better position by Amtrak's appearance on the scene. True, Amtrak benefits. But if we know one immutable principle in the law of just compensation it is that value to the taker is not to be considered; only loss to the owner is to be valued. United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943).
 
 
 28
 None of the cases cited by petitioners is on point. In Southeastern Pennsylvania Transportation Authority v. ICC, 644 F.2d 238 (3d Cir.1981), while the court ruled that in certain circumstances (not at issue in this case) there should be an "equitable sharing" of the costs of ownership, that holding was based on the court's view of the legislative intent behind the 3R Act and the FSP, not on its view of constitutional dictates. See id. at 249-52. In re Penn Central Transportation Co., 440 F.Supp. 1069 (E.D.Pa.1977), holds that a private corporation may not be required to provide a public service without recovering a reasonable rate of return, see id. at 1074, something that is not involved in this case since the ICC is not requiring MTA to operate its commuter services at a loss. In In re Valuation Proceedings, 531 F.Supp. 1191 (Regional Rail Reorg. Ct.1981), the court was merely trying to determine the level of compensation that the parties would have arrived at by arm's-length negotiation. See id. at 1342. The model of negotiation between a willing buyer and a willing seller is inappropriate to the instant case: Amtrak is the only passenger railroad that has or seeks to have access to Metro-North's lines, and it is required by statute to provide service over the Harlem-Hudson Line. The two ICC trackage rights cases, Missouri-Kansas-Texas Railroad Co. v. Kansas City Terminal Railway Co., 198 I.C.C. 4, 11 (1933), and Chicago, Milwaukee, Saint Paul & Pacific Railroad Co. Trackage Rights, 342 I.C.C. 578, 589, aff'd sub nom. Louisville & Nashville Railroad Co. v. United States, 369 F.Supp. 621 (W.D.Ky.), aff'd by order, 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 733 (1973), do not hold, as petitioners contend, that the Fifth Amendment requires a "usage-based sharing of fully allocated costs." Rather, in each case the Commission was concerned with the level of compensation that would allow common carriers to compete effectively. These decisions stand for the proposition that to foster competition the Commission can order a carrier to give another carrier trackage or terminal rights. Neither opinion interprets the RPSA, under which Congress has determined that, at least as to cases under section 402(a), proper compensation consists only of the payment of avoidable costs. Neither involves the question of how much compensation is constitutionally required. Thus, there is no support for Metro's claim that section 402(a)'s adoption of the avoidable cost methodology is constitutionally infirm.
 
 III. The Tenth Amendment
 
 29
 MTA advanced a claim before the ICC, based on National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), that the requirement that MTA permit the operation of Amtrak trains over its lines violates the Tenth Amendment because it conscripts the services of a state agency to aid a federal public purpose. Since National League of Cities was recently overturned in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), petitioners can now only argue that section 402(a) is "destructive of state sovereignty," id. 105 S.Ct. at 1020, and thus violates the Tenth Amendment under Garcia. However, Garcia held that claims of state sovereignty do not bar congressional action under the Commerce Clause, but rather are "more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." Id. at 1018. In Garcia, the Court held that the imposition of minimum wage requirements on a local transit authority was not destructive of state sovereignty, especially in light of the massive subsidy provided by the federal government to that authority. Petitioners' Tenth Amendment argument is unavailing.
 
 IV. Petitioners' Other Objections
 
 30
 Petitioners make three other objections: that the Commission (1) improperly found that they could not have achieved major track discontinuances in the absence of Amtrak; (2) also improperly found that MTA could not charge Amtrak for the use of space at GCT because MTA had no proprietary interest in the space; and (3) erred by declining to apply its order retroactively to a date prior to the stipulation between MTA and Amtrak. We find none of these rulings arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. See Staten Island Rapid Transit Operating Authority v. ICC, 718 F.2d 533, 539 (2d Cir.1983); Long Island Rail Road Co. v. United States, 568 F.2d 254, 257 (2d Cir.1977).
 
 
 31
 The Commission correctly found that petitioners had not shown that they could abandon any tracks (specifically two of the four tracks between Spuyten Duyvil and Croton-Harmon) were Amtrak not using the lines. Petitioners have neither the consent of Conrail, the trackage rights user, nor of Penn Central, the lessor. Nor is it by any means clear that such consent would be given. Conrail, in particular, appears to have a strong interest in preserving the status quo. As of 1983 it accounted for over one-third of the use of this segment of lines, whether measured in gross ton miles or car miles. Moreover, Metro-North operates 102 trains a day over this segment of line compared to Amtrak's eighteen, so that, absent some additional evidence, the claim that by eliminating less than one-sixth of the trains Metro could eliminate one-half of the physical plant seems unrealistic. In any event, the Commission did "direct Amtrak to contribute toward track maintenance in an amount determined under the SGTF [sic] formula"; petitioners do not complain about that formula, which is based on "Speed Factored Gross Ton Miles."
 
 
 32
 Similarly, the space used by Amtrak at GCT is not within MTA's leasehold. Amtrak had the right to free use of space at GCT under the original 1971 Penn Central-Amtrak Agreement. Petitioners argue that the Settlement Agreement entered into between Penn Central and Amtrak on February 15, 1978, "cancelled" the 1971 Agreement. However, under the Settlement Agreement the parties simply agreed not to assert against each other any claims based, inter alia, on the 1971 Agreement. The 1978 Agreement specifically states in paragraph 3 that "Amtrak and Penn Central agree that any rights of either against third parties ... acquired under [the 1971 Agreement] shall remain in full force and effect." Thus, the 1971 Agreement was not "cancelled" as to Amtrak's rights vis a vis MTA, and the Commission correctly concluded that Amtrak could continue to have free use of the GCT space.
 
 
 33
 As to retroactivity, the Commission has no jurisdiction to fix compensation in this respect absent the consent of the parties. See National Rail Passenger Corp. and Union Pacific Railroad Co., 348 I.C.C. 926, 935-37 (1977). In a letter dated December 31, 1982, the parties agreed that compensation should be determined as of January 1, 1983. This date seems particularly appropriate since before January 1, 1983, Conrail, not MTA, provided the facilities and services required for Amtrak operations and Amtrak has paid Conrail in full for having done so.
 
 
 34
 Petition denied.
 
 
 
 [1]
 All citations to the United States Code are to the 1982 edition unless otherwise indicated
 
 
 [2]
 The cost base against which each methodology is applied is made up of three components: "solely related costs," such as the salary of a Metro-North dispatcher assigned full-time to watch over the operation of Amtrak trains; "directly attributable costs," such as the wage of a Metro-North mechanic who keeps a log of the specific number of hours he works on Amtrak cars in need of temporary repairs and those he devotes to MTA equipment; and "common costs," those which by their very nature cannot be identified as benefitting just Amtrak or MTA trains or Conrail's, e.g., a fixed common cost that does not vary as a result of usage, such as the cleaning of a culvert under the track, or a variable common cost that depends on the amount of usage, such as replacing worn track. See Southeastern Pa. Transp. Auth. v. ICC, 644 F.2d 238, 244-45 (3d Cir.1981)
 
 
 [3]
 The Commission has consistently applied section 402(a) to all railroads. See Minnesota Transfer Ry. Co., 354 I.C.C. 552, modified, 354 I.C.C. 769 (1978); National R.R. Passenger Corp. & Terminal R.R. Ass'n, 348 I.C.C. 901 (1977), aff'd sub nom. National R.R. Passenger Corp. v. ICC, 610 F.2d 865 (D.C.Cir.1979); Amtrak & Texas & Pacific Ry. Co., 348 I.C.C. 645 (1976), aff'd in relevant part sub nom. National R.R. Passenger Corp. v. ICC, 610 F.2d 865 (D.C.Cir.1979); Amtrak & Washington Terminal Co., 348 I.C.C. 86 (1975), modified, 348 I.C.C. 859 (1977), aff'd sub nom. National R.R. Passenger Corp. v. ICC, 610 F.2d 881 (D.C.Cir.1979)
 
 
 [4]
 Section 504(f) of RPSA provides:
 Amtrak Commuter shall not be subject to any lease or agreement with a commuter authority under which financial support was being provided on January 2, 1974, for the continuation of rail passenger service, except that the Corporation and Conrail shall retain appropriate trackage rights (for passenger and freight operations respectively) over any rail properties owned or leased by such commuter agency. Compensation for such trackage rights shall be just and reasonable.
 45 U.S.C. Sec. 584(f).